Dissent by Judge Ikuta OPINION GOULD, Circuit Judge: Appellant produce growers (“Growers”)[1] sold their perishable agricultural products on credit to a distributor, Tanimura Distributing, Inc. (“Tanimura”). Under the Perishable Agricultural Commodities Act (“PACA”), 7 U.S.C. §§ 499a-499s, this arrangement made Tanimura a trustee over a PACA trust holding the perishable products and any resulting proceeds for Growers as PACA-trust beneficiaries. Tanimura sold the agricultural products on credit to third parties. It then transferred the resulting accounts receivable to Appellee AgriCap Financial (“AgriCap”) through a-transaction AgriCap describes as a “Factoring Agreement” or sale of accounts.[2] Although described as a sale of accounts, the Factoring Agreement involved some hallmarks of a secured lending arrangement: AgriCap referred to itself as “Lender,” and the written agreement was entitled “AgriCap Financial Corporation Factoring and Security Agreement.” Further, AgriCap was granted security interests in accounts receivable and all other asset classes except inventory; UCC financing statements were filed; other debts were subordinated; and there was a measure of recourse for AgriCap against Tani-mura if AgriCap could not collect from Tanimura’s customers — for example, Agri-Cap was entitled to force Tanimura to “repurchase” accounts that remained unpaid after 90 days, and AgriCap could enforce this light by withholding payments from Tanimura. The central dispute in this case developed after Tanimura’s business failed, and Growers did not receive full payment from Tanimura for their produce.[3] Growers sued AgriCap alleging: (1) that the Factoring Agreement was merely a secured lending arrangement structured to look like a sale; (2) that the accounts receivable and proceeds, therefore, remained trust property under PACA; (3) that because the accounts receivable remained trust property, Tani-mura breached the PACA trust and Agri-Cap was complicit in the breach; and (4) that under PACA the PACA-trust beneficiaries, including Growers, held an interest superior to that of any secured lender. Hence, AgriCap was liable to Growers to repay the value of the accounts receivable. AgriCap moved for summary judgment arguing that, under Boulder Fruit Express & Heger Organic Farm Sales v. Transportation Factoring, Inc., 251 F.3d 1268 (9th Cir. 2001), a trustee is allowed to remove assets from the trust in any commercially reasonable way without breaching the trust. And, it argued, the factoring agreement was commercially reasonable, like the one upheld in Boulder Fruit. Growers acknowledged that a PACA trustee generally may sell PACA-trust assets on commercially reasonable terms without breaching trust duties. They argued, however, that under precedents from the Second, Fourth and Fifth Circuits,[4] a court should not review the commercial reasonableness of a factoring agreement unless and until the court first determines that a true sale actually occurred.[5] According to Growers, a true sale only occurs when a PACA trustee transfers not only the right to collect the underlying accounts, but also the risk of non-payment on those accounts.[6] The district court described the cited eases as a circuit split and granted summary judgment in favor of AgriCap relying on Boulder Fruit. The district court reasoned that the Ninth Circuit in Boulder Fruit expressly addressed the commercial reasonableness of a factoring agreement but implicitly rejected a separate, transfer-of-risk test. The district court further reasoned that the factoring agreement in Boulder Fruit transferred even less risk than did the Factoring Agreement here— in Boulder Fruit, the factoring agent enjoyed unrestricted discretion to' force the distributor to repurchase accounts. The district court concluded that, even if Boulder Fruit could accommodate the transfer-of-risk test, the facts of Boulder Fruit controlled and precluded relief for Growers. The district court finally concluded that the Factoring Agreement was commercially reasonable because AgriCap paid Tanimura 80% of the face value of the accounts, an amount that has never been found to be unreasonable, as an up-front payment and AgriCap ultimately paid Tan-imura an even greater percentage of the face value of the transferred accounts. On appeal, Growers argued to the three-judge panel that we are not bound by Boulder Fruit because Boulder Fruit did not discuss the transfer-of-risk test, leaving open the question of whether that test should apply in the Ninth Circuit. AgriCap countered by contrast with its argument that Boulder Fruit settled the issue because the PACA-trust beneficiaries in Boulder Fruit asked the Court to apply the transfer-of-risk test; the parties in that case briefed the issue; the issue was squarely before the Court; and yet, the Court did not apply the test. The three-judge panel agreed with the district court’s conclusion that Boulder Fruit controlled the outcome in this case. S & H Packing & Sales Co., Inc. v. Tanimura Distrib., Inc., 850 F.3d 446, 450-51 (9th Cir.), reh’g en banc granted, 868 F.3d 1047 (9th Cir. 2017); see Arizona v. Tohono O’odham Nation, 818 F.3d 549, 555 (9th Cir. 2016); see also United States v. Lucas, 963 F.2d 243, 247 (9th Cir. 1992) (noting that subsequent panels are bound by prior panel decisions and only the en banc court may overrule panel precedent). The three-judge panel reasoned that had the Boulder Fruit court not implicitly rejected the transfer-of-risk test, the holding of the case necessarily would have been different. Judge Melloy wrote a separate concurring opinion suggesting that the Ninth Circuit, sitting en banc, should eliminate a circuit split and expressly adopt a separate threshold transfer-of-risk test joining several other circuits. S & H Packing & Sales Co., 850 F.3d at 451 (Melloy, J., concurring).[7] A majority of the active judges on this Court agreed to rehear this appeal en banc. I We have jurisdiction under 28 U.S.C. § 1291. Boulder Fruit, 251 F.3d at 1270. “We review grants of summary judgment de novo.” Balint v. Carson City, Nev., 180 F.3d 1047, 1050 (9th Cir. 1999). We must determine, viewing the evidence in the light most favorable to the nonmov-ing party, whether the district court applied the substantive law correctly. Id. II Although the parties ask us to answer many particularized questions on appeal, we resolve only one issue: whether, in the context of determining the assets included in a PACA trust, a court needs to conduct a threshold true sale inquiry before it determines whether a transaction transferring PACA trust assets was a commercially reasonable sale. For the reasons stated below, we join the Second, Fourth and Fifth Circuits in adopting a threshold true sale test to determine whether assets transferred in transactions that are labeled “sales” remain assets of a PACA trust. We hold that a court must conduct a two-step inquiry when determining whether the questioned transaction is a sale or creates a security interest, i.e., a loan. First, a court must apply a threshold true sale test of which the transfer-of-risk is a key, but not the sole, factor. If a court concludes that there was a true sale, it must then determine if the transaction was commer-dally reasonable. If there was not a true sale, the court’s inquiry stops there and the assets remain in the trust. If there was a true sale but the sale was not commercially reasonable, there is a breach of the trust and the assets likewise remain in the trust. If, however, the court concludes that there was a true sale and that the transaction was commercially reasonable, the buyer owns the assets free and clear of the trust. We hold that a district court should look to the substance of the transaction to determine whether the transaction is a true sale or a secured loan. In doing so, the transfer of risk should be a primary factor to which a court looks. Ill We elaborate on the principles just summarized, with reference to pertinent authorities and reasoning. A “Congress enacted PACA in 1930 to prevent unfair business practices and promote financial responsibility in the fresh fruit and produce industry.” Boulder Fruit, 251 F.3d at 1270. Congress amended PACA in 1984 “‘to remedy [the] burden on commerce in perishable agricultural commodities and to protect the public interest’ caused by accounts receivable financing arrangements that ‘encumber or give lenders a security interest’ in the perishable agricultural commodities superior to the growers.” Id. (alteration in original) (quoting 7 U.S.C. § 499e(c)(1)). PACA creates a statutory trust in an effort to remedy this burden: Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. 7 U.S.C. § 499e(c)(2). “This provision imposes a ‘nonsegregated floating trust’ on the commodities and their derivatives, and permits the commingling of trust assets without defeating the trust.” Endico Potatoes, 67 F.3d at 1067 (citation omitted). The House Report explaining the 1984 PACA amendments states: [Purchasers/Distributors of perishable agricultural commodities] in the normal course of their business transactions, operate on bank loans secured by the inventories, proceeds or assigned reeeiv-ables from sales of perishable agricultural commodities, giving the lender a secured position in the case of insolvency. Under present law, sellers of fresh fruits and vegetables are unsecured creditors and receive little protection in any suit for recovery of damages where a buyer has failed to make payment as required by contract. H.R. Rep. No. 98-543 at *3 (1984), as reprinted in 1984 U.S.C.C.A.N. 405, 407. The Second Circuit, citing, this report, explained: According to Congress, due to the need to sell perishable commodities quickly, sellers of perishable commodities are often placed in the position of being unsecured creditors of companies whose creditworthiness the seller is unable to verify. Due to a large number of defaults by the purchasers, and the sellers’ status as unsecured creditors, the sellers recover, if at all, only after banks and other lenders who have obtained securi.ty interests in the defaulting purchaser’s inventories, proceeds, and receivables. Endico Potatoes, 67 F.3d at 1067. Given this history, it is evident that our focus should be upon the true nature of the transactions at issue and the true nature of the parties’ roles — that of seller and buyer or that of secured lender and borrower. Perhaps most importantly, Congress intended to shield agricultural growers from risk in enacting PACA “to protect the public interest.” 7 U.S.C. § 499e(c)(1). PACA’s purpose is not to give a one-sided boon to growers, but instead, to benefit all parties and society by ensuring that growers are protected; lenders know them risk; and agricultural commerce is encouraged to benefit society. B We apply general trust principles to questions involving PACA trusts, unless those principles directly conflict with PACA. Boulder Fruit, 251 F.3d at 1271; see also Endico Potatoes, 67 F.3d at 1067; Reaves, 336 F.3d at 413. Because ordinary principles of trust law apply to trusts created under PACA, trust assets are excluded from the bankruptcy estate if the PACA trustee goes bankrupt. Sunkist Growers, Inc. v. Fisher, 104 F.3d 280, 282 (9th Cir. 1997). A breach of trust occurs when there is “a violation by the trustee of any duty which as trustee he owes to the beneficiary.” Boulder Fruit, 251 F.3d at 1271 (quoting Restatement (Second) of Trusts § 201 (1959)). A trustee is required by federal regulation “to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities.” Id. (quoting 7 C.F.R. § 46.46(d)(1)). The duty to maintain trust assets is far-reaching. Federal regulation dictates that “[a]ny act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of [PACA].” Id. (second alteration in original) (quoting 7 C.F.R. § 46.46(d)(1)). Non-segregated floating trusts under PACA permit the commingling of trust assets and allow the PACA trustee to convert trust assets into proceeds. Boulder Fruit, 251 F.3d at 1272; see also Endico Potatoes, 67 F.3d at 1067; A&J Produce Corp. v. Bronx Overall Econ. Dev. Corp., 542 F.3d 54, 57-58 (2d Cir. 2008). The transferees of trust assets, such as AgriCap here, “are liable only if they had some role in causing the breach or dissipation of the trust.” Boulder Fruit, 251 F.3d at 1272; Restatement (Second) of Trusts § 283 (1959) (“If the trustee transfers trust property to a third person ... [without] committing] a breach of trust, the third pei-son holds the interest so transferred or created free of the trust, and is under no liability to the beneficiary.”). C Against this industry and legal background, a PACA trustee’s true sale of accounts receivable for a commercially reasonable discount from the accounts’ face value is not a dissipation of trust assets and, therefore, is not a breach of the PACA trustee’s duties. Nickey Gregory, 597 F.3d at 598 (“The assets of the trust would thus have been converted into cash and the receivables would no longer have been trust assets. Obviously, under this scenario, [the factoring agent] would own the accounts receivable and would be able to do with them what it wished.”); Reaves Brokerage, 336 F.3d at 413-14 (holding that “a ‘bonafide purchaser’ of trust assets receives the assets free of claims by trust beneficiaries” and noting that the determinative issue on appeal is whether the “factoring agreement” was a loan secured by accounts receivable or a true sale of accounts receivable); Boulder Fruit, 251 F.3d at 1271-72 (“[NJothing in PACA or the regulations prohibits PACA trustees, from attempting to turn receivables into cash by factoring. To the contrary a commercially reasonable sale of accounts for fair value is entirely consistent with the trustee’s primary duty.”); Endico Potatoes, 67 F.3d at 1067-69 (noting that “the well’ recognized principle from trust law that a bona fide purchaser of trust assets receives the assets free of any claim by the trust beneficiaries” was determinative, and because the financier had received only a security interest, its interest was subject to the rights of the growers). That sale is, in substance, a conversion of trust assets from accounts receivable into cash. See Boulder Fruit, 251 F.3d at 1271. The Second, Fourth, and Fifth Circuits have held that any purported security interest for a lender in PACA-trust assets is inferior to the trust beneficiaries’ claims and rights. See, e.g., Nickey Gregory, 597 F.3d at 598-99 (“Thus, if the accounts receivable were held by [the factoring agent] as collateral to secure repayment of a loan, they would also have been held for the benefit of produce sellers, and the produce sellers would have effectively enjoyed a first-creditor position in them.”); Endico Potatoes, 67 F.3d at 1069 (“Because [the factoring agent] held only a security interest ... its interest is subject to the rights of the PACA trust beneficia-nes. ,.. [The factoring agent] must, therefore, disgorge amounts collected on the accounts after [the distributor’s] bankruptcy filing to the extent necessary to satisfy claims of PACA trust beneficiaries.”); A&J Produce, 542 F.3d at 58 (“A creditor holding ‘only a security interest,’ therefore, retains that interest ‘subject to the rights of the trust beneficiaries.’ ”). Notwithstanding the absence of discussion of a “true-sale” or “transfer-of-risk” test, even Boulder Fruit made clear that a lender’s use of PACA-trust assets as collateral to secure a debt could not create a priority security interest ahead of the position enjoyed by PACA trust beneficiaries.[8] IV The treatment of true sales and security interests under PACA and trust law is reasonably clear. But what is at issue here, and is not perfectly clear, is the proper analysis to apply when the true nature of the transaction is ambiguous — i.e., when it resembles a sale in some respects and yet looks like a secured transaction in others. Growers and the Second, Fourth, and Fifth Circuits would apply a threshold transfer-of-risk test to determine if a transaction is a true sale or is more accurately viewed as a secured lending relationship. AgriCap, relying on Boulder Fruit, argues vigorously that the court need only ask if the transaction was commercially reasonable. A Boulder Fruit held that factoring agreements do not per se breach the PACA trust because “a trustee can sell trust assets unless the sale breaches the trust.” 251 F.3d at 1272. The court concluded that “a commercially reasonable sale of accounts for fair value is entirely consistent with the trustee’s primary duty under PACA and 7 C.F.R. § 46.46(d)(1) — to maintain trust assets so that they are ‘freely available to satisfy outstanding obligations to sellers of perishable commodities.’ ” Id. at 1271. Boulder Fruit reasoned that the commercial reasonableness of a factoring agreement depends upon the terms of the agreement. For example, “[a] PACA trustee who sells accounts for pennies on the dollar, just to turn a quick buck, might well have breached the PACA trust, while a trustee who factors accounts at a commercially reasonable rate would not.” Id. The Boulder Fruit panel, in reaching its conclusion, said that the factoring agreement “actually enhanced the trust.” Id. at 1272. Boulder Fruit considered not only the initial up-front payment from the factoring agent to the distributor but also the actual sums paid to the distributor by the factoring agent while performing the factoring agreement.[9] Id. Boulder Fruit did not, however, examine the substance of the rights transferred to determine what the factoring agent agreed to do, what risk the factoring agent accepted when it accepted the right to collect on the transferred accounts, and whether the transaction should properly be deemed a true sale rather than a mere secured lending arrangement. Rather, Boulder Fruit characterized the transaction as a sale or factoring agreement without discussing the factoring agent’s rights and ability to seek recourse against the distributor, In sharp contrast, the Second, Fourth, and Fifth Circuits found it necessary to examine the rights and risks transferred between the parties to a factoring agreement. The courts in these cases examined the text and legislative history of PACA and the regulations promulgated under PACA to conclude that Congress intended to promote the interests of produce growers above the interests of secured lenders. See, e.g., Nickey Gregory, 597 F.3d at 594-95, 598-99; Endico Potatoes, 67 F.3d at 1066-68. The Fourth Circuit stressed that representatives of the secured lending community had voiced concern over PACA’s likely effect upon secured lenders and the factoring industry. Nickey Gregory, 597 F.3d at 599. That court concluded that Congress nevertheless found that the balance of policy interests favored placing those lenders in a position inferior to unpaid growers. Id. The Endico Potatoes court resolved a case wherein Merberg, a dealer in perishable agricultural commodities received financing from CIT, and CIT held security interests in all Merberg’s assets including accounts receivable. 67 F.3d at 1066. Mer-berg went through a bankruptcy and the growers sought reimbursement from CIT for the amounts left unpaid. Id. The court defined the issue before it as whether the transaction between CIT and Merberg constituted a purchase for value or whether the exchange gave CIT no more than a security interest. Id. at 1068. The court reasoned, “[i]n determining the substance of the transaction, the Court may look to a number of factors, including the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the creditor’s right to the assets assigned if the debtor were to pay the debt from independent funds, whether the debt- or has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces debt.” Id. That court found, “[t]the root of all of these factors is the transfer of risk.” Id. at 1069. The court relied upon the fact that the agreement had a provision that let CIT demand payment at any time and a provision that terminated CIT’s interest if Merberg paid its outstanding obligation. Id. The court held that because CIT only held a security interest in Merberg’s accounts receivable, CIT’s interest was subject to the rights of the PACA trust beneficiaries. Id. A question may be raised whether the Second Circuit no longer espouses the view that the substance of an agreement must be analyzed when determining the rights of the parties. In E. Armata, Inc. v. Korea Commercial Bank of New York, 367 F.3d 123, 126 (2d Cir. 2004), the Second Circuit considered whether, under PACA, a bank was liable to the beneficiaries of a PACA trust for receipt of funds when the bank extended revolving overdraft privileges to the produce dealer and applied deposited PACA funds to reduce the negative balance in the produce dealer’s overdrawn account. Id. The court, in concluding that the bank was not liable to PACA trust beneficiaries, reasoned that the bank did not breach the trust. Id. at 131; see also American Banana Co., Inc. v. Republic Nat’l Bank of NY, N.A., 362 F.3d 33, 42 (2d Cir. 2004) (“Nor are we convinced that a trustee’s payments of commercially reasonable fees and interest in exchange for routine banking services such as check cashing services and overdraft privileges extended to facilitate payments to beneficiaries constitute a breach of the PACA trust.”). The Second Circuit in its E. Ar-mata decision, while it cited Boulder Fruit for specified purposes,[10] did not purport to overrule Endico Potatoes or to limit it. A subsequent Second Circuit opinion, A&J Produce Corp. v. Bronx Overall Economic Development Corp, held that a lender who had a lien on trust assets held that lien “subject to the rights of the trust beneficiaries” i.e., the growers, 542 F.3d 54, 58 (2d Cir. 2008). It further noted that “[a]ny other result would elevate the rights of secured creditors above those of PACA creditors, contrary to the intent to the statute. Id. at 59; see also Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701, 707 (2d Cir. 2007) (noting that in E. Armata they did not hold that any commercially reasonable transaction avoids breaching fiduciary responsibilities but that “whether a transaction is commercially reasonable is simply one factor that may be relevant in determining whether a PACA trustee has met its ultimate burden of proving that trust assets remained freely available to plaintiffs”). In Reaves, the Fifth Circuit considered a case where Reaves, a produce seller, sold produce to Sunbelt Fruit & Vegetable Company, a wholesaler, and Sunbelt ceased operations owing Reaves almost $200,000 in unpaid invoices. 336 F.3d at 412. Reaves sued Fidelity Factors, LLC, because Fidelity had purchased particular accounts receivable from Sunbelt. Id. The court framed the issue before it as whether the “factoring agreement” between Sunbelt and Fidelity was a loan secured by accounts receivable or a sale of accounts receivable. Id. at 414. The court reasoned that the “[c]haracterization of the agreement turns on the ‘substance of the relationship’ between Fidelity and Sunbelt, ‘not simply the label attached to the transaction.’ ” Id. The court looked to the Second Circuit’s risk-transfer analysis and also conducted an independent examination of the substance of the agreement and concluded that the relationship between Fidelity and Sunbelt was that of a secured lender and debtor. Id. The court reasoned that the agreement and its provisions, when read in their entirety, “confirm that the risk of non-payment or underpayment is entirely borne by Sunbelt.” Id. at 415 (emphasis in original). The court pointed to continuing lien and single indebtedness language, a personal guaranty from Sunbelt’s president, and recordation of the agreement with the UCC to support its conclusion. Id. at 416. The court also distinguished Boulder Fruit because it found that the commercially reasonable analysis did not apply when the factoring agreement is the “functional equivalent” of a secured lending agreement, noting that the “discrete issue before the Boulder Fruit court was whether an acknowledged factoring agreement was ‘commercially reasonable’.” Id. at 417 (emphasis in original). In Nickey Gregory, the Fourth Circuit addressed a case where Robison Farms, a distributor of produce, bought produce from growers on short-term credit, and distributed the produce to restaurants and school systems on credit creating accounts receivable. 597 F.3d at 596. When Robison Farms began experiencing financial difficulties it sought a line of credit from Agri-Cap and assigned the accounts receivable to AgriCap in exchange for an advance of 80% of the face value of the accounts. Id. AgriCap collected the accounts receivable, kept the 80% for itself, and remitted the remaining 20% to Robison Farms minus fees and interest. Id. Notwithstanding the credit agreement, Robison Farms closed its doors without paying the growers what was owing and filed for bankruptcy. Id. at 596-97. The court framed the issue before it as whether the district court erred in concluding that AgriCap’s transaction was a loan agreement. Id. at 600. The Fourth Circuit upheld the district court’s conclusion that the transaction was a loan agreement because (1) AgriCap referred to itself as a “Lender” and Robison Farms a “Borrower” in the agreement, (2) Robison farms did not transfer risk of noncollection of accounts receivable to AgriCap — Agri-Cap had a right to demand that Robison Farms repurchase any receivable that went unpaid or was disputed, (3) documents related to the transaction referred to the accounts receivable as collateral for repayment, (4) AgriCap had a Subordination Agreement that gave it “a first priority security interest in the Collateral”, (5) the owner of Robison Farms gave AgriCap a personal guarantee, and (6) AgriCap filed a UCC-1 Financing Statement for the transaction. Id. at 601-03. The court concluded that the substantive aspects of the transaction were inconsistent with a sale of assets, and that the transaction was in “essence a loan in the form of a revolving line of credit secured by accounts receivable.” Id. at 603. The court finally concluded that because the transaction was a loan, the accounts receivable and their proceeds never left the PACA trust, and their proceeds had to be made available for payment of the claims of unpaid PACA creditors first. Id. The Fourth Circuit distinguished Boulder Fruit concluding that in Boulder Fruit there was a “true factoring relationship, in which the receivables were actually sold to the factor.” Id. at 604. The Fourth Circuit found that Boulder Fruit did not question whether there had actually been a sale. Id. at 604. The weight of authority and reasoning in the Second, Fourth and Fifth Circuit cases suggest that “transfer of risk” and “true sale” considerations should be assessed before considering commercial reasonableness when considering the propriety of a transfer of trust assets. We conclude that adoption of the transfer-of-risk test or true sale test is the logical outcome of a reading of PACA, PACA’s legislative history, and consideration of PACA’s purpose. B Given the remedy that Congress created to alleviate the perceived problem of conflict in rights of agricultural growers and secured lenders — creation of the trust elevating commodities sellers’ interests over lenders’ interests — Congress’s clear concern with the relative interests of secured lenders and commodities sellers, and the general contours of trust law — in particular, a trustee’s ability to sell or convert trust assets — courts must focus on the true substance of PACA-related transactions and not on artificial indicators or labels. It runs counter to PACA and its history to allow the simple use of the words “sale,” “purchase,” or “factoring agreement” to be central for purposes of assessing the relative rights of lenders and produce growers. AgriCap at oral argument asserted that the AgriCap transaction benefitted Growers as AgriCap paid Tanimura more than the 80% discount on the accounts receivable and never used the recourse provision. The Second, Fourth, and Fifth Circuits conclude, however, that a transfer of the primary or direct risk of non-payment on the accounts is the hallmark of a true sale. Nickey Gregory, 597 F.3d at 601-03; Reaves Brokerage, 336 F.3d at 417; Endico Potatoes, 67 F.3d at 1068-69. See also In re Arctic Exp. Inc., 636 F.3d 781, 800 (6th Cir. 2011) (“The rationale of the Fourth Circuit’s decision in Nickey Gregory is transferable to the case at bar, which involves a similar revolving loan agreement secured by Arctic’s accounts receivable.”). These courts and PACA regulations assess trust asset encumbrance in terms of what a factoring agreement could authorize and not in terms of what money was actually paid to the trustee under the agreement. See, e.g., 7 C.F.R. § 46.46(a)(2) (“ ‘Dissipation’ means any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions.”). In assessing whether a true sale occurred, the Fourth Circuit adopted the transfer-of-risk test developed by the Second Circuit in Endico Potatoes. Nickey Gregory, 597 F.3d at 600-03. There, the Second Circuit distinguished between direct risk and secondary or derivative risk. Endico Potatoes, 67 F.3d at 1068-69. The Endico court said that it was appropriate to examine several factors such as “[1] the right of. the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, [2] the effect on the creditor’s right to the assets assigned if the debtor were to pay the debt from independent funds, [3] whether the debtor has a right to any funds recovered from the sale of assets above that necessary to satisfy the debt, and [4] whether the assignment itself reduces the debt.” Endico Potatoes, 67 F.3d at 1068. The court in Endico Potatoes concluded: “The root of all of these factors is the transfer of risk.” Id. at 1069. Finally, the court there summarized: Where the lender' has purchased the accounts receivable, the borrower’s debt is extinguished and the lender’s risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of nonperformance by the account debtor. If the lender holds only a security interest, however, the lender’s risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor’s non-payment will leave the borrower unable to satisfy the loan. Id. (emphasis in original). We conclude that this transfer-of-risk test should be applied to avoid reliance on labels in factoring agreements that would defeat the purposes of PACA. As Judge Melloy reasoned in his separate concurrence in the three-judge panel’s decision: “A factoring agent who accepts risk of non-payment on the transferred accounts is the owner of the accounts, for better or worse ... [internal citation omitted]. That risk will be reflected in the price. A factoring agent who functionally serves only as a lender and collection Arm, however, accepts accounts for collection but enjoys the right to force the distributor to repurchase non-performing accounts. Such a factoring agent faces much less risk — risk measured only by the limitations on the repurchase provisions and by the distributor’s solvency and ability to perform under the agreement.” S & H Packing & Sales Co., 850 F.3d at 457. The price paid for the accounts with and without recourse will differ. AgriCap nevertheless argues that adoption of the transfer-of-risk test would lead to absurd results in which a factoring agent remains liable to growers even though the factoring agent’s payments to a distributor were sufficient, in theory, for the distributor to pay growers. AgriCap is wrong to describe such a scenario as absurd. It is instead the result of a congressional policy choice. There is an analogy in the relationship between general contractors, subcontractors, and property owners in the context of mechanics’ liens. It is well established that a property owner who makes final payment to a general contractor without first securing a release of subcontractors’ mechanics’ liens holds the property subject to those liens with exposure to the subcontractors’ claims despite substantial payments to the general contractor. See, e.g., Jackson v. Flohr, 227 F.2d 607, 611 (9th Cir. 1955) (“Mechanics’ liens are provided by statute in order to give the furnisher of labor and material, security against the realty so that it is unnecessary to rely upon the personal responsibility of the contractor.”); Brewer Corp. v. Point Ctr. Fin., Inc., 223 Cal. App. 4th 831, 839, 167 Cal.Rptr.3d 555 (2014), as modified on denial of reh’g (Feb. 27, 2014) (“A mechanic’s lien is a claim against real property, which may be filed if a claimant has provided labor or furnished materials for the property and has not been paid.”); Gary C. Tanko Well Drilling, Inc. v. Dodds, 117 Cal. App. 3d 588, 593, 172 Cal.Rptr. 829 (Ct. App. 1981) (explaining that a mechanic’s lien is the remedy provided by the California Constitution for enforcing against the owner of property payment of the debt incurred for the performance of labor, or the furnishing of material used in construction). Unpaid subcontractors will have interests that prevail over the property owner (who may seek recourse against the general contractor, but who still face direct liability to the subcontractors on their liens). State legislative action places the interests of subcontractors ahead of those of property owners. Property owners must manage this risk by diligently ensuring that subcontractors’ liens are released before giving full payment to a general contractor. Similarly, by placing the burden of due diligence on lenders rather than growers, Congress was well aware of the effect it was imposing on the lending industry. As Judge Melloy previously observed, “Congress concluded, however, that lenders could adapt. The House Committee expressly noted that anticipated improvements to commerce would offset the lenders’ anticipated burdens.” S & H Packing & Sales Co., 850 F.3d at 458; see also H.R. Rep. No. 98-543 at *4 (“[T]he statutory trust requirements will not be a burden to lending institutions. They will be known to and considered by prospective lenders in extending credit. The assurance the trust provision gives that raw products will be paid for promptly and that there is a monitoring system provided for under [PACA] will protect the interests of the borrower, the money lender, and the fruit and vegetable industry.”). The propriety of comparing the PACA situation to mechanics’ liens finds support in an examination of the regulations promulgated under PACA. Again, the reasoning in Judge Melloy’s concurrence is helpful: “These regulations do not ask whether a factoring arrangement in fact resulted in a transfer of funds sufficient to pay growers throughout the course of performance under a factoring agreement. Rather, the regulations ask whether such an arrangement could impair trust assets. See 7 C.F.R. § 46.46(a)(2). Just as a property owner must conduct due diligence to avoid liability to a subcontractor before making final payment to a general contractor, a factoring agent with knowledge of PACA must act with diligence. It does not matter that a factoring agent paid a distributor sufficient funds to pay growers any more than it matters that a property owner paid a general contractor sufficient funds to pay subcontractors. In light of these statutory and common law protections, it cannot properly be the case that a distributor and factoring agent may defeat trust beneficiaries’ rights merely by invoking the labels ‘sale’ or ‘factoring agreement.’” S & H Packing & Sales Co., 850 F.3d at 458. Further, there would seem to be no doubt that a legislature has the power to define and limit liens. See Mercy Hosp. & Med. Ctr. v. Farmers Ins. Grp. of Companies, 15 Cal.4th 213, 61 Cal.Rptr.2d 638, 932 P.2d 210, 215 (1997) (“Whatever principles might generally apply to liens, former section 3045.4 is a statutory, not a common law, lien. Thé Legislature is, of course, free to define and limit such a lien, and has done so in this case.”). As recognized under California law, when there are competing liens, “the text of the statute prevails if it establishes the priority to be accorded to the statutory lien.” County of San Bernardino v. Calderon, 148 Cal. App. 4th 1103, 1112, 56 Cal.Rptr.3d 333 (2007). The Calderon court concluded that the California’s statutory hospital lien did not have priority over other liens by right, stating, “other liens may take priority”. Id. at 1113, 56 Cal.Rptr.3d 333 (citing Cal. Civ. Code § 3045.4). The court reasoned that the California legislature knew how to create express priority as evidenced by its treatment of a county’s right to action against a third party for reimbursement, where the statute states that the county has a “first lien”. Id. (citing Gov. Code § 23004,1). Other examples of states creating priority interests over secured creditors are seen in Iowa’s agricultural supply dealer lien statute and Wisconsin’s tow truck statutory lien. In Iowa, agricultural supply dealers have a “super priority” interest above bank lenders in the livestock of the farmers. In re Schley, 565 B.R. 655, 658 (Bankr. N.D. Iowa 2017) (“An agricultural supply dealer who provides an agricultural supply to a farmer shall have an agricultural lien as provided in section 554.9102.”); see Iowa Code § 570A.5. In Wisconsin, a person who has the license to perform towing services and does so has a priority interest, up to a statutory amount, over a bank’s lien and has a right to retain possession of the vehicle until its costs are satisfied. See In re Ingram, 508 B.R. 98, 102 (Bankr. E.D. Wis. 2014); Wis. Stat. § 779.415(1g)(a). Indeed, whenever we deal with competing liens, whether established by legislations or common law, we deal not with the question of whether a party has a valid debt obligation that is secured and should be paid, but rather with the question of which claimant to funds has priority. Similarly here, Congress has made a clear policy choice giving PACA creditors priority over secured creditors. We must keep PACA’s purpose in mind when reviewing transactions that may in substance limit that congressional policy. C The dissent is not incorrect in asserting that the distinction between a sale and a secured lending agreement does not ordinarily make a difference under general trust principles, so long as the transaction at issue is commercially reasonable. But we respectfully and forcefully disagree that this is true in the context of a PACA trust. See Boulder Fruit, 251 F.3d at 1271 (“[GJeneral trust principles [apply] to questions involving the PACA trust, unless those principles directly conflict with PACA.”). PACA was enacted to protect trust beneficiaries, who were often in the position of unsecured creditors, from receiving little or nothing when a distributor went bankrupt. See 7 U.S.C. § 499e(c)(l). The dissent is not completely blind to the policy motivation behind PACA of protecting growers over lenders, but we think the dissent gives too little weight to the protective purpose of PACA. The dissent strives to add protection for the benefit of lenders, but loses sight of the PACA statutory language establishing the PACA trust, and disregards the purpose of PACA to protect agricultural growers. To accomplish its protective purpose, PACA subordinates all secured creditor rights to the rights of the unpaid growers and charges the PACA trustee to preserve the rights of trust beneficiaries by making sure that PACA trust assets — the accounts receivable — are not dissipated. See id. at § 499e(c)(2); 7 C.F.R. 46.46(d)(1) (“[Trustees] are required to maintain trust assets in a manner that such assets are freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities. Any act or omission which is inconsistent with this responsibility, including dissipation of trust assets, is unlawful and in violation of section 2 of the Act.”). When there is a sale of assets — as relevant here, accounts receivable — there is a conversion of the assets from one form, accounts receivable, to another, cash. See Boulder Fruit, 251 F.3d at 1271. The accounts receivable are no longer in the trust, and therefore, there cannot be a dissipation of trust assets from the buyer’s latpr collection on those receivables. When there is a secured lending agree-mdnt or loan, however, the accounts receivable remain trust assets and are only collateral to the lender. See Nickey Gregory, 597 F.3d at 603. In that context, the trustee under PACA is obligated not to dissipate those trust assets. See id. at 604. As the court in Nickey Gregory correctly concluded, in those circumstances, there is a breach of trust whenever the lender recovers its fee or percentage from the accounts receivable while the trust beneficiaries have not been fully compensated. 597 F.3d at 604; see 7 C.F.R. § 46.46(a)(2) (precluding the trustee from participating in “any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions”). This does not mean that every loan or lending agreement made to a distributor acts to breach a PACA trust, but it does mean that whenever a loan is made, a PACA trustee must be careful to ensure all trust beneficiaries are paid before the lender collects. If a trustee gives a lender a security interest in PACA trust assets, and the growers are not fully repaid, that would be a breach of the PACA trust and a violation of PACA. Here, whether the transaction at issue was a sale or a loan makes a difference because a sale removes the accounts receivable from the PACA trust while the enforcement of a loan in this case would have breached the PACA trust because AgriCap received its full payment while GW Palmer remained unpaid. Therefore, the district court must determine whether the transaction was in substance a sale or a loan.[11] y Congress intended PACA to prevent secured lenders from defeating the rights of PACA-trust beneficiaries. The growers in this Circuit will have effectively lost that protection if lenders gain protection by labeling what are in substance security agreements as if they were factoring agreements. The Congressional focus upon the relative rights of these two groups, growers and lenders, is evident. For this reason, before a court assesses the commercial reasonableness of a factoring agreement, it should first examine the substance of a factoring agreement to ensure that a true sale of the accounts receivable has occurred. Absent a true sale, the labels surrounding a factoring agreement should be of little or no consequence. The substance of the transaction controls. If the substance of a transaction reveals a secured lending arrangement rather than a true sale, the accounts receivable remain trust assets. In that case, unpaid trust beneficiaries will hold an interest in accounts receivable and their proceeds superior to all unsecured and secured creditors such that the trust beneficiaries should prevail.[12] The dominant consideration here is that the Congress of the United States in its language in the PACA statute and in the policy considerations underlying PACA has made a clear choice that the rights of agricultural growers are to be given priority over the rights of secured lenders through the vehicle of the PACA trust. If Tanimura made a true sale of its receivables to AgriCap, acting as a factor, and if it was for fair value and a commercially reasonable amount, then the PACA trust was not offeiided. But on the other hand, if the challenged transaction was not a true sale but rather a secured lending arrangement, then the plaintiff Growers have a claim that must be resolved in further proceedings. What makes this case difficult is that the challenged transaction has some features both of a sale and of a loan. On remand the district court may use all the tools at its disposal, consistent with what we have said in this opinion, including the taking of testimony and making findings of fact, to determine whether the agreement was in substance a true sale or in substance a lending agreement, and thereafter to proceed in a way consistent with this opinion, We hold that before considering the commercial reasonableness of a transaction, a court must first apply a threshold true sale test for which the transfer-of-risk is a primary factor.[13] To the extent that our en banc opinion today contradicts Boulder Fruit, we overrule Boulder Fruit. We vacate the judgment of the district court and remand for further proceedings consistent with this opinion. VACATED and REMANDED. Each party shall bear them own costs. . Growers are tomato suppliers whose various lawsuits against Tanimura Distributing, Inc. were consolidated into one case before the district court. . Factoring is “the commercial practice of converting receivables into cash by selling them at a discount.” Boulder Fruit Express & Heger Organic Farm Sales v. Transp. Factoring, Inc., 251 F.3d 1268, 1271 (9th Cir. 2001) (citing Black’s Law Dictionary (7th ed. 1999)). . Tanimura owed Growers more than $800,000 when Tanimura ceased operation. . See Nickey Gregory Co. v. Agricap, LLC, 597 F.3d 591, 598 (4th Cir. 2010); Reaves Brokerage Co., Inc. v. Sunbelt Fruit & Vegetable Co., Inc., 336 F.3d 410, 414 (5th Cir. 2003); and Endico Potatoes, Inc. v. CIT Group/Factoring, Inc., 67 F.3d 1063, 1067-69 (2d Cir. 1995). . See, e.g., Reaves Brokerage, 336 F.3d at 414 (holding that the "[c]haracterization of the agreement at issue turns on the substance of the relationship” and "not simply the label attached to the transaction,” and concluding that the relationship "was that of a secured lender and debtor, not a seller and buyer” (internal quotation marks and citations omitted)). .The Second Circuit described the transfer-of-risk test as follows: Where the lender has purchased the accounts receivable, the borrower’s debt is extinguished and the lender’s risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. If the lender holds only a security interest, however, the lender’s risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor’s non-payment will leave the borrower unable to satisfy the loan. Endico Potatoes, 67 F.3d at 1069. . This opinion is in substantial agreement with arguments made in Judge Melloy's concurrence and draws heavily therefrom. . The Ninth Circuit stated: Farmer sells oranges on credit to Broker. Broker turns around and sells the oranges on credit to Supermarket, generating an account receivable from Supermarket. Broker then obtains a loan from Bank and grants Bank a security interest in the account receivable to secure the loan. Broker goes bankrupt. Under PACA, Broker is required to hold the receivable in trust for Farmer until Farmer was paid in full; use of the receivable as collateral was a breach of the trust. Therefore, Farmer’s rights in the Supermarket receivable are superior to Bank’s. In fact, as a trust asset, the Supermarket receivable is not even part of the bankruptcy estate. Boulder Fruit, 251 F.3d at 1271. . The 20% discount at issue in Boulder Fruit represented a discount from the accounts’ face value as paid in an initial payment from the factoring agent to the PACA trustee. It did not represent the final amount paid nor did it represent a floor or a ceiling on what the factoring agreement in Boulder Fruit could have required the factoring agent to pay. . Specifically, the court there said in part: "We agree with the Ninth Circuit in Boulder Fruit, that it is not a breach of trust for a PACA dealer to use PACA funds to enter into 'commercially reasonable’ transactions with parties not protected by PACA, particularly where such transactions facilitate a PACA dealer’s fulfillment of his obligations to PACA beneficiaries.” Id. at 133. . The dissent seeks to give financial institutions the edge in this case over agricultural growers. But the analysis of the dissent is fundamentally flawed because it elevates the interests of financial institutions, the factoring organization AgriCap, over the interests of agricultural growers who PACA aimed to protect. As examples: • First, the dissent says that ''[t]he majority posits thát the growers have a priority lien on their produce, which allows the trust to accept the benefit of a loan agreement but disregard the obligation to repay it." Dissent at 37. But nowhere do we suggest that trusts are free to disregard their obligations to lenders. A trustee cannot, however, enforce an obligation to a lender above its statutory obligation to trust beneficiaries to not dissipate trust assets. • Second, the dissent suggests that if “the trustee still owed AgriCap money on the loan, then AgriCap would be entitled to foreclose its security interest on the accounts receivable according to the terms of the loan agreement.” Dissent at 53 n.15. This argument exceeds what even the Appellee AgriCap understands PACA to allow. AgriCap’s counsel admitted during oral argument, that if it was a true lending agreement, any interest that it had in the accounts receivable as a creditor would be subordinate to the growers. Ninth Circuit Court of Appeals, Oral Argument 14-56069 G.W. Palmer v. AgriCap Financial Corp., Youtube 27:07-28:47 (Sept. 20, 2017), https://www. youtube.com/watch?v=iikaXV7nkaw. Only an argument in desperation would ignore this concession. • Third, the dissent contends that we have not considered the implications of our decision today. Dissent at 60-61 n.21. That is incorrect. We have stated what we believe to be the proper test for the district court to employ in the first instance, realizing the limits of our ability to review issues like damages when there is no prior development of the record on appeal on those and related issues. Our court should not participate in the dissent's interested speculation and conjecture on issues not before us. • Fourth, the dissent offers no judicial authority supporting its view that under PACA a commercially reasonable lending agreement can displace the trust beneficiary rights of the agricultural growers. Further, while challenging the strength of the various circuit precedents that we contend are aligned with our decision, the dissent unmistakably concedes that its position would squarely conflict with the decision of the Fourth Circuit in Nickey Gregory. Dissent at 54-55. The dissent makes this concession arguing more or less that it thinks Nickey Gregory is “critically flawed.” Dissent at 52. However, given the language and purposes of PACA, we see no reason why we should engineer a conflict with the Fourth Circuit’s decision in Nickey Gregory. See Kelton Arms Condo. Owners Ass’n, Inc. v. Homestead Ins. Co., 346 F.3d 1190, 1192 (9th Cir. 2003) (''[W]e decline to1 create a circuit split unless there is a compelling reason to do so” particularly when “rules are best applied uniformly.”); CTIA-The Wireless Ass’n v. City of Berkeley, California, 873 F.3d 774, 776 (9th Cir. 2017). . We note that the calculation of damages, if applicable, is left to the district court to review in the first instance after determining the substance of the accounts receivable transactions. . There remain other questions about when the transactions are reviewed and whether to apply the test asset-by-asset or taken together. We leave to the district court’s discretion to determine the appropriate procedure for conducting this analysis as the district court is in a better position to do so after briefing from the parties on these issues.