**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**November 27, 2019**

**Elisabeth A. Shumaker**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

MEUERS LAW FIRM, P.L., a Florida
limited liability company, as assignee and
PACA trustee of Crossroads Fresh
Connections, Inc.,

      Plaintiff - Appellant /
      Cross - Appellee,

v.

REASOR'S, LLC, an Oklahoma limited
liability company doing business as
Reasor's Foods,

      Defendant - Appellee /
      Cross - Appellant.

No. 18-5055 & 18-5059
(D.C. No. 4:16-CV-00208-GKF-JFJ)
(N.D. Okla.)

_____

**ORDER AND JUDGMENT**[*]
_____

Before **BRISCOE**, **BALDOCK**, and **CARSON**, Circuit Judges.
_____

_____

     [*] This order and judgment is not binding precedent, except under the doctrines
of law of the case, res judicata, and collateral estoppel. It may be cited, however, for
its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

These cross appeals arise from the district court's adjudication[1] of federal claims brought under the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. §§ 499a–499s. Specifically, Meuers Law Firm (as assignee of Crossroads Fresh Connection, Inc., a wholesaler) asserted before the district court that Reasor's Foods (a grocery store) was unlawfully in possession of $308,721.73 that was subject to a statutory PACA trust, and therefore the $308,721.73 must be returned to Meuers for dispersal to the PACA trust beneficiaries (a group of farmers and produce sellers referenced as "the Suppliers").

The district court granted judgment in favor of Meuers, but only for $135,818.59. The district court reasoned that Crossroads consented to a set off in the amount of $172,903.14 for rebates Crossroads owed to Reasor's, and therefore that amount could not be recovered for the beneficiaries of the PACA trust. On cross appeal, Reasor's argues that it is entitled to keep all $308,721.73, or that, in the alternative, the district court's division of funds should be upheld.

Exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm in part, reverse in part, and remand to the district court with instructions to enter judgment for Meuers in the additional sum of $172,903.14 and to grant any other relief it may deem appropriate.

---

[1] The parties submitted the case for decision on stipulated facts and exhibits. [App. at 77–138.] The parties filed "motions for judgment" with the district court, which permitted the district court to resolve all factual disputes necessary for judgment. [*See id.* at 254.] The district court's order contains no additional findings of fact beyond those to which the parties stipulated. [*See id.* at 239–55.]

# I

Before recounting the relevant factual and procedural background, we provide a brief introduction to PACA.

## A.    The Perishable Agricultural Commodities Act (PACA)

"Congress enacted PACA in 1930 to regulate the sale and marketing of produce in interstate commerce." *Am. Banana Co. v. Republic Nat'l Bank of N.Y.*, 362 F.3d 33, 36 (2d Cir. 2004).  Fifty years later, "Congress examined the sufficiency of the PACA . . . and determined that prevalent financing practices in the perishable agricultural commodities industry were placing the industry in jeopardy." Regulations Under the Perishable Agricultural Commodities Act (PACA): Growers' Trust Protection Eligibility and Clarification of "Written Notification," 81 Fed. Reg. 90,255, 90,255 (proposed Dec. 14, 2016) (explaining statutory background).  Two financing practices in particular were troubling.  First, Congress noted that there was an increase in buyers of perishable agricultural commodities who were slow to pay, or entirely failed to pay, their suppliers.  *Id.*  Second, Congress discovered that perishable agricultural commodities buyers would commonly grant a security interest to lenders in their inventories, proceeds from sale, and accounts receivables of such commodities.  *Id.*; *see also* 7 U.S.C. § 499e(c)(1) (explaining the "burden on commerce in perishable agricultural commodities caused by [certain] financing agreements").

Therefore, in 1984, Congress amended PACA "by impressing a trust on the commodities and sales proceeds of perishable agricultural commodities for the

3

benefit of the unpaid seller . . . ."  Act of May 7, 1984, Pub. L. No. 98-273, 98 Stat. 165.  The amendment added a new subsection (c) to PACA § 5.  *Id.* (codified as amended at 7 U.S.C. § 499e(c)).  In relevant part, PACA § 5(c) provides:

> (c) **Trust on commodities and sales proceeds for benefit of unpaid suppliers, sellers, or agents; preservation of trust; jurisdiction of courts**
>
> \*        \*        \*
>
> (2)  Perishable agricultural commodities received by a commission merchant, dealer, or broker in all transactions, and all inventories of food or other products derived from perishable agricultural commodities, and any receivables or proceeds from the sale of such commodities or products, shall be held by such commission merchant, dealer, or broker in trust for the benefit of all unpaid suppliers or sellers of such commodities or agents involved in the transaction, until full payment of the sums owing in connection with such transactions has been received by such unpaid suppliers, sellers, or agents. Payment shall not be considered to have been made if the supplier, seller, or agent receives a payment instrument which is dishonored. The provisions of this subsection shall not apply to transactions between a cooperative association, as defined in section 1141j(a) of Title 12, and its members.

7 U.S.C. § 499e(c)(2).  A PACA trust's assets, therefore, consist of perishable agricultural commodities "received . . . in all transactions," "all inventories of food or other products derived from perishable agricultural commodities," and "any receivables or proceeds from the sale of such commodities or products."  *Id.* § 499e(c)(2); *see also* 7 C.F.R. § 46.46(b) (same).[2]  "Trust assets are to be preserved

---

[2] In early 2018, the United States Department of Agriculture ("USDA") amended 7 C.F.R. § 46.46, but did not alter the definition of PACA trust assets found in 7 C.F.R. § 46.46(b).  *See* Perishable Agricultural Commodities Act (PACA): Guidance on Growers' Trust Protection Eligibility and Clarification of "Written

4

as a nonsegregated 'floating' trust" because "[c]ommingling of trust assets is contemplated." 7 C.F.R. § 46.46(b). Additionally, sellers of perishable agricultural commodities must satisfy certain statutory notice requirements to preserve their trust protections under PACA. *See* 7 U.S.C. § 499e(c)(3)–(4).

We now turn to the relevant factual and procedural background.

## B. Factual Background

Crossroads was, from March 2010 to April 2014, in the wholesale produce business. [App. at 78.] Crossroads ran its business from a warehouse in Tulsa, Oklahoma, and operated under a valid United States Department of Agriculture PACA license. [*Id.*] Reasor's operates a chain of grocery stores throughout Northeastern Oklahoma, has a valid PACA license, and often bought produce from Crossroads. [*Id.*] Crossroads purchased produce from various farmers (the aforementioned Suppliers) and sold the produce to Reasor's. One of the Suppliers was Keith Connell. [*Id.* at 105.] Connell also holds a valid PACA license, and when he sold produce to Crossroads, he gave written notice of his intent to preserve PACA trust benefits by including the statutory language provided by 7 U.S.C. § 499e(c)(4) on each invoice sent to Crossroads.[3] [*Id.*] When Crossroads ceased its business operations, it owed Connell more than $1,000,000 for produce. [*Id.* at 81.]

_____

Notification," 83 Fed. Reg. 5175, 5176 (Feb. 6, 2018) (codified at 7 C.F.R. § 46.46(d), (f)(1)(iv)).

[3] 7 U.S.C. § 499e(c)(4) provides that:

Beginning in March 2010, Reasor's agreed to purchase produce from Crossroads, and Crossroads agreed that, in return, Reasor's was entitled to a quarterly rebate worth 3% of Reasor's total purchases from Crossroads each quarter. [*Id.* at 78.] Pursuant to this agreement, Reasor's issued an invoice to Crossroads at the end of each quarter for the 3% rebate. [*Id.* at 79.] Crossroads would then issue a check to Reasor's for the invoiced amount. [*Id.*]

On January 17, 2014, Reasor's issued an invoice for $141,962.16 to Crossroads for its fourth quarter of 2013 rebate ("Q4 2013 Rebate"). [*Id.*] Later, on February 14, 2014, Reasor's informed Crossroads that an internal audit showed that Reasor's was entitled to an additional rebate of $30,940.98 ("Audited Rebate"). [*Id.*] Thus, by February 14, 2014, Crossroads owed Reasor's $172,903.14 for the Q4 2013 Rebate and the Audited Rebate.

From March 23, 2014, through April 7, 2014, Crossroads sold and delivered $409,459.04 worth of produce to Reasor's. [*Id.* at 80.] Approximately halfway through this period, on March 31, Reasor's notified Crossroads that it was ending

[A] licensee may use ordinary and usual billing or invoice statements to provide notice of the licensee's intent to preserve the trust. The bill or invoice statement must . . . contain on the face of the statement the following: "The perishable agricultural commodities listed on this invoice are sold subject to the statutory trust authorized by section 5(c) of the Perishable Agricultural Commodities Act, 1930 (7 U.S.C. 499e(c)). The seller of these commodities retains a trust claim over these commodities, all inventories of food or other products derived from these commodities, and any receivables or proceeds from the sale of these commodities until full payment is received."

their relationship effective April 4, 2014.[4]  [*Id.*]  The next day, Crossroads contacted Reasor's to ask whether Reasor's would pay Crossroads for its produce that Friday "as usual."  [*Id.* at 96.]  Crossroads sought that assurance because it feared that it might not be able to make payroll without Reasor's payment.  [*Id.* at 95–96.]  On April 2, 2014, Reasor's confirmed that it would pay that Friday, but also inquired about "the overdue status of the [outstanding] rebate[s] in the amount of $172,903.14."  [*Id.* at 95.]  The next morning, Crossroads asked if Reasor's could deduct half of the outstanding rebate amount in its upcoming payment and then deduct the rest in its final payment.  [*Id.*]  Reasor's agreed to do so.  [*Id.* at 94.]

On April 4, 2014, Crossroads officially ceased its business operations.  [*Id.* at 80.]  On April 8, 2014, Reasor's notified Crossroads that it was owed $126,303.90 for its first quarter of 2014 rebate ("Q1 2014 Rebate").  [*Id.* at 81.]  At some point after April 8, Reasor's claimed that Crossroads owed $9,514.69 for Reasor's second quarter of 2014 rebate ("Q2 2014 Rebate").  The following is a listing of the rebate amounts Reasor's claimed:

1. Q4 2013 Rebate: $141,962.16
2. Audited Rebate: $30,940.98
3. Q1 2014 Rebate: $126,303.90
4. Q2 2014 Rebate: $9,514.69

Total Rebate Claims: $308,721.73

---

[4] At this time Crossroads owed various produce suppliers more than $2,000,000, including more than $1,000,000 to Connell. [*See* App. at 80, 105.]

7

## C. Procedural Background

After Crossroads ceased its business operations, Keith Connell sued Crossroads on April 9, 2014, to enforce his PACA trust rights. *See Keith Connell, Inc. v. Crossroads Fresh Connections, Inc.*, No. 4:14-CV-0166-CVE-TLW (N.D. Okla. filed Apr. 9, 2014). He argued that, by his complying with PACA, all proceeds from the produce he sold to Crossroads were held in a statutory trust (the "Suppliers-Crossroads PACA Trust") and should be paid out to him (and any other eligible suppliers) before any other Crossroads creditor. [App. at 105–06.] Connell's lawsuit resulted in a consent injunction that appointed Meuers as trustee of the Suppliers-Crossroads PACA Trust. [*Id.* at 108.] In that role as trustee, Meuers was responsible for obtaining any outstanding assets that belonged to the Suppliers-Crossroads PACA Trust. [*Id.* at 108–12.] As trustee of the Suppliers-Crossroads PACA Trust, Meuers asked Reasor's to pay its outstanding produce balance owed to Crossroads ($409,459.04). Rather than pay the full amount of the outstanding produce balance, Reasor's deducted its Total Rebate Claims ($308,721.73) from the outstanding produce balance it owed to Crossroads and paid the remaining $100,737.31 to Meuers. [*Id.* at 81–82.]

Meuers then filed the present lawsuit against Reasor's to recover the Total Rebate Claims ($308,721.73) Reasor's had withheld. As relevant to these cross appeals, Meuers argued that Reasor's was a third-party unlawfully in possession of trust property (the $308,721.73) belonging to the Suppliers-Crossroads PACA Trust.

8

**II**

This case comes to us in an unusual posture. As the dissent points out, PACA appears to contain terms that govern rebates like the ones at issue here. "In 1995, PACA was amended to establish that certain payments were not illegal[.]" *JSG Trading Corp. v. USDA*, 176 F.3d 536, 538 (D.C. Cir. 1999). Congress added the following sentence, now codified at 7 U.S.C. § 499b(4): "However, this paragraph shall not be considered to make the good faith offer, solicitation, payment, or receipt of collateral fees and expenses, in and of itself, unlawful under this chapter." Perishable Agricultural Commodities Act Amendments of 1995, Pub. L. No. 104–48, § 9(b)(3), 109 Stat. 424, 430 (1995). Congress also defined "collateral fees and expenses," now codified at 7 U.S.C. § 499a(b)(13), as "any promotional allowances, rebates, service or materials fees paid or provided, directly or indirectly, in connection with the distribution or marketing of any perishable agricultural commodity." Pub. L. No. 104–48, § 9(a), 109 Stat. 424, 429–30.

Yet the parties in this case never raised or litigated the potential applicability of PACA provisions regarding "collateral fees and expenses." Although we may affirm a judgment based on any ground supported by the record, our exercise of discretion in this area depends on whether (1) the alternate ground was "fully briefed and argued here and below;" (2) the parties had "a fair opportunity to develop the factual record;" and (3) "in light of factual findings to which we defer or uncontested facts, our decision would involve only questions of law." *Brown v. Perez*, 835 F.3d

9

1223, 1236 (10th Cir. 2016) (quoting *Elkins v. Comfort*, 392 F.3d 1159, 1162 (10th Cir. 2004)).

Not one of these factors supports deciding this case based on §§ 499b(4) and 499a(b)(13). The applicability of these PACA provisions was not raised at all in the district court or on appeal, let alone "fully briefed." And because no one understood these portions of the statute were in play, the parties had no occasion or opportunity to develop relevant facts. Section 499b(4) turns on a "good faith offer, solicitation, payment, or receipt" of a rebate. USDA regulations define "good faith" in this context as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." 7 C.F.R. § 46.2. As we have noted in other settings, subjective good faith is typically an issue of fact, not an issue of law. *See, e.g., Haberman v. The Hartford Ins. Grp.*, 443 F.3d 1257, 1269–70 (10th Cir. 2006) (stating that under Oklahoma insurance law, when there is conflicting evidence as to good faith and fair dealing, "what is reasonable is always a question of fact to be determined by the trier of fact by a consideration of the circumstances in each case") (citation omitted).

An examination of the record confirms that no party developed or submitted to the district court facts bearing on the "good faith" element of PACA's "collateral fees and expenses" defense. The stipulated facts presented by the parties say nothing about "honesty in fact" or "reasonable commercial standards of fair dealing in the trade" vis-à-vis the rebates offered to Reasor's by Crossroads. [App. at 77–83.] Nor did the district court make any factual findings on these issues. [*Id.* at 239–55.] It

10

would be uncharacteristic under any circumstances for this court to serve as the initial trier of fact on an issue of good faith. It would be virtually unprecedented for this court to fulfill that fact-finding role without evidence from the parties or rulings from the district court to guide the analysis. The dissent's hypothesis that Reasor's must have been on the lookout for evidence of bad faith, and therefore the *absence* of evidence on this issue proves Crossroads' good faith, is pure speculation.

As a result, we decide this case based on the arguments actually presented by the parties, as opposed to positions the parties could have taken. This means today's ruling is case specific – addressing only the arguments these parties have raised in the context of the factual background determined by the district court. Nothing in the opinion should be read as nullifying the "collateral fees and expenses" language in § 499b(4), § 499a(b)(13), or any other PACA provisions not cited by the parties. Those statutory terms may dictate the outcome in a future case involving rebates providing the parties raise and brief those issues. This limitation on our holding eliminates the risk of setting a precedent that, in the dissent's words, "reinforces error."

## III

"In an appeal from a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo." *Sw. Stainless, LP v. Sappington*, 582 F.3d 1176, 1183 (10th Cir. 2009) (quoting *Weyerhaeuser Co. v. Brantley*, 510 F.3d 1256, 1260 (10th Cir. 2007)). As the district court relied on the parties'

11

stipulated facts and made no additional factual findings, the arguments actually presented by the parties in these cross appeals involve only questions of law.

There is no dispute that the Suppliers are "unpaid suppliers or sellers of [perishable agricultural] commodities" within the meaning of § 499(e)(2).[5] There is also no dispute that the Suppliers complied with the statutory notice requirements of § 499e(c)(3)–(4) and thereby preserved their PACA trust rights when they sold perishable agricultural commodities to Crossroads. It is likewise undisputed that Reasor's withheld $308,721.73 to satisfy its Total Rebate Claims. However, Reasor's contends that it should prevail on cross appeal for two reasons. First, Reasor's argues that under the plain language of PACA, the $308,721.73 at issue is not subject to the Suppliers-Crossroads PACA Trust. Second, Reasor's asserts that it should prevail under general trust principles. We find neither argument persuasive.

### A. Whether PACA trust protections are limited to financing arrangements

Congress employed expansive language to define the property subject to a PACA trust. On its face, PACA appears to apply to "all" transactions involving perishable agricultural commodities. *See* 7 U.S.C. § 499e(c)(2) ("Perishable agricultural commodities received by a commission merchant, dealer, or broker in *all* transactions, . . . shall be held . . . in trust for the benefit of all unpaid suppliers or

---

[5] Under PACA, the term "perishable agricultural commodity" "[m]eans any of the following, whether or not frozen or packed in ice: Fresh fruits and fresh vegetables of every kind and character; and . . . cherries in brine as defined by the Secretary in accordance with trade usages." 7 U.S.C. § 499a(b)(4).

sellers . . . until full payment . . . has been received by such unpaid suppliers, sellers, or agents.") (emphasis added). "All" means "the whole amount, quantity, or extent of," or "as much as possible." *All*, Merriam-Webster Dictionary, https://www.merriam-webster.com/dictionary/all (last visited July 8, 2019). Reasor's, however, argues that "all" must be read in the context of the legislative finding provided in 7 U.S.C. § 499e(c)(1). When read in this context, Reasor's argues, PACA trust protections extend only to "all transactions" involving a security interest or similar financing arrangements. Section 499e(c)(1) sets forth the legislative reasoning for the 1984 PACA amendment:

> It is hereby found that a burden on commerce in perishable agricultural commodities is caused by *financing arrangements* under which commission merchants, dealers, or brokers, who have not made payment for perishable agricultural commodities purchased, contracted to be purchased, or otherwise handled by them on behalf of another person, *encumber or give lenders a security interest* in, such commodities, or on inventories of food or other products derived from such commodities, and any receivables or proceeds from the sale of such commodities or products, and that such arrangements are contrary to the public interest. This subsection is intended to remedy such burden on commerce in perishable agricultural commodities and to protect the public interest.

7 U.S.C. § 499e(c)(1) (emphasis added). Therefore, according to Reasor's, Congress only intended to remedy a particular, limited burden on interstate commerce through the 1984 amendment to PACA: scenarios where "commission merchants, dealers, or brokers" grant a lender a security interest in perishable agricultural commodities, in inventories of products derived from perishable agricultural commodities, or in any receivable or proceeds from the sale of perishable agricultural commodities before

13

the merchants, dealers, or brokers pay their suppliers. *See id.* Reasor's argues that, since this case does not involve a security interest, PACA does not apply.[6]

We are not persuaded. Reasor's fails to explain how the plain language of the broad congressional remedy provided in § 499e(c)(2) is somehow inconsistent with the specific burden on interstate commerce identified in § 499e(c)(1). Extending PACA trust protections to "all transactions"—both those encumbered by security interests and those that are not—"remed[ies] [the identified] burden on commerce in perishable agricultural commodities and . . . protect[s] the public interest." 7 U.S.C. § 499e(c)(1)–(2). Moreover, if Congress desired to limit PACA trust protections to the certain transactions in 7 U.S.C. § 499e(c)(2), it could have employed the precise language found in 7 U.S.C § 499e(c)(1) (such as "security interest" or "financing arrangements") rather than the language it ultimately used ("all"). But Congress decided otherwise, and courts may not "rewrite the statute that Congress has enacted." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 136 S. Ct. 1938, 1949 (2016) (quoting *Dodd v. United States*, 545 U.S. 353, 359 (2005)). Accordingly, we are bound by the express congressional command to extend PACA trust protections to "all transactions" involving perishable agricultural commodities, not just those involving security interests.

---

[6] We note that while this case does not involve a security interest, it does involve a recurring quarterly 3% rebate.

14

**B.     Whether Reasor's Prevails Under General Trust Principles**

As recognized by the district court, "the interpretation of PACA trust interests is guided by general trust principles to the extent there is no conflict with the statute." *Skyline Potato Co. v. Hi-Land Potato Co.*, 188 F. Supp. 3d 1097, 1110 (D.N.M. 2016) (citing *In re Arctic Express, Inc.*, 636 F.3d 781, 798 (6th Cir. 2011)).[7] And under the salient general trust principles we can only conclude that Reasor's should have disgorged all of $308,721.23 in trust assets in its possession.

*1.     Trust Terminology*

We begin with a refresher on general trust principles. A trust "is a fiduciary relationship with respect to property, . . . subjecting the person who holds title to the property to duties to deal with it for the benefit" of another. Restatement (Third) of Trusts § 2 (Am. Law Inst. 2003). "[A] trust involves three elements: (1) a trustee, who holds the trust property and is subject to duties to deal with it for the benefit of one or more others; (2) one or more beneficiaries, to whom and for whose benefit the trustee owes the duties with respect to the trust property; and (3) trust property, which is held by the trustee for the beneficiaries." *Id.* § 2 cmt. f; *see also id.* § 3 (defining trust property, trustee, and beneficiary). "A breach of trust is a failure by the trustee to comply with any duty that the trustee owes, as trustee, to the beneficiaries, or to further the charitable purpose, of the trust." *Id.* § 93. One of

---

[7] Circuit courts look to the Restatement (Second) of Trusts (Am. Law Inst. 1959) and the Restatement (Third) of Trusts (Am. Law Inst. 2003) for guidance on general trust principles. *See Skyline Potato Co.*, 188 F. Supp. 3d at 1110–11 (collecting cases).

15

these duties is "a duty to administer the trust," which "includes a duty, at the outset of administration, to take reasonable steps to ascertain the assets of the trust estate and to take and keep control of those assets." *Id.* § 76(1) & cmt. d.

In this case, and pursuant to PACA, Crossroads was the trustee of the Suppliers-Crossroads PACA Trust;[8] the Suppliers are the beneficiaries of the Suppliers-Crossroads PACA Trust; and, as the parties and district court appeared to agree, an account receivable (for $308,721.73) was an asset held by the Suppliers-Crossroads PACA Trust. There is a dispute, however, concerning whether the account receivable was "transferred" from Crossroads to Reasor's and thereby remained trust property.

2.      *Transfer of the Suppliers-Crossroads PACA Trust Property*

As explained above, under the plain language of the statute, the perishable agricultural commodities themselves, any inventories of products derived from the perishable agricultural commodities, and "any receivables or proceeds from the sale of such commodities or products" are PACA trust assets. 7 U.S.C. § 499e(c)(2). Here, then, when Crossroads sold any perishable agricultural commodities that it purchased from the Suppliers, the resulting account receivable, by operation of law, was immediately held in trust pursuant to PACA for the benefit of the Suppliers until they were paid in full. *See PACA Tr. Creditors of Lenny Perry's Produce, Inc. v.*

---

[8] As stated previously, Meuers is now the trustee of the Suppliers-Crossroads PACA Trust.

16

*Genecco Produce, Inc.*, 913 F.3d 268, 277 (2d Cir. 2019). The district court reached this same conclusion [App. at 253], but then took a wrong turn.

The district court "conclude[d] Reasor's [wa]s entitled to judgment" on the breach of trust claim because "[i]n the bankruptcy context at least, 'it is well-settled that setoffs are not transfers.'" [9] [App. at 254, quoting *In re Porter*, 562 B.R. 658, 659 n.1 (Bankr. E.D. Va. 2016).] Therefore, according to the district court, since a setoff is not a transfer, "Meuers has not shown Reasor's possesses Crossroads' account receivable—or any other asset of the Suppliers-Crossroads PACA Trust— that could be disgorged." *Id.* It is important to note, however, that in the bankruptcy context "transfer" is actually defined in the Bankruptcy Code. *See* 11 U.S.C. § 101(54) (defining transfer). "The definition, though broad in scope, does not expressly include setoff." *In re Damas*, 504 B.R. at 296. And bankruptcy courts have given full effect to this congressional choice, in the bankruptcy context, "to exclude setoff from the meaning of transfer." *Id.* Since this case does not involve the Bankruptcy Code, we are not bound by the congressional choice to exclude setoff from the Code's definition of "transfer."

---

[9] The complete context of the bankruptcy court's opinion cited by the district court follows: "[I]t is well-settled that setoffs are not transfers *and therefore are not avoidable under 11 U.S.C. § 547(b)." In re Porter*, 562 B.R. at 659 n.1 (quoting *In re Damas*, 504 B.R. 290, 296 (Bankr. D. Mass. 2014)) (emphasis added). Therefore, in *Porter*, the bankruptcy court did not state that setoffs are not transfers as a general matter, but instead that, under the Bankruptcy Code, a setoff is not "any transfer of an interest of the debtor in property" that "the trustee may avoid" within the meaning of 11 U.S.C. § 547(b).

Instead, we give the term "transfer" its plain, ordinary meaning. A "transfer" is "[a]ny mode of disposing of or parting with an asset or an interest in an asset, including a gift, the payment of money, release, lease, or creation of a lien or other encumbrance." *Transfer*, Black's Law Dictionary (10th ed. 2014). In this case, Crossroads disposed of an asset of the Suppliers-Crossroads PACA Trust (the account receivable) when it allowed Reasor's to set off the $308,721.23. That is plainly a transfer, and since Crossroads failed to "keep control of [trust] assets," Crossroads agreeing to Reasor's set off was a breach of trust. Restatement (Third) of Trusts § 76 cmt. d. As a result, in the absence of some defense, Reasor's must disgorge the Suppliers-Crossroads PACA Trust assets held in its possession.

### 3. Reasor's Remaining Defenses

Reasor's presents three final defenses to support its position that it is entitled to keep the Suppliers-Crossroads PACA Trust assets. First, Reasor's asserts that "the entire set off was authorized by Crossroads." Second Br. (Reasor's) at 15 (capitalization removed).[10] Second, Reasor's argues that "PACA trust claims can only be asserted by a PACA beneficiary who is in privity with the buyer/fiduciary." *Id.* at 18. Finally, Reasor's claims that it has presented an affirmative defense under general trust principles. We disagree with each assertion.

---

[10] The district court found "[t]his argument persuasive, but only as to the $172,903.14 in rebates discussed in the email exchange between" representatives from Crossroads and Reasor's. [App. at 250.]

To begin, the consent of Crossroads (as trustee of the Suppliers-Crossroads PACA Trust) to any transfer of trust property is irrelevant under general trust principles. Under general trust principles, consent of the beneficiary, not the trustee, determines whether a third party may permissibly retain trust property it received in breach of trust without incurring liability. Restatement (Second) of Trusts § 315 (rights of third-party where beneficiary consents to transfer of trust property). In this case, the Suppliers never consented to the set off against the Suppliers-Crossroads PACA Trust assets. Therefore, Reasor's is (absent some other defense) liable as a third party unlawfully in possession of trust assets.

Reasor's next argument, that it is not in privity with the Suppliers, is also flawed. The plain language of PACA does not limit which party may bring a claim under PACA, and therefore general trust principles apply. Under general trust principles, "[a] trustee may maintain a proceeding against a third party on behalf of the trust and its beneficiaries." Restatement (Third) of Trusts § 107(1). This is so "even if a loss or potential loss to the trust or an improper benefit to the third party is attributable to the trustee's misconduct." *Id.* § 107 cmt. (b)(1). In fact, "an action to recover trust property transferred in breach of trust may be maintained against a third party by the very trustee who made the improper transfer." *Id.*

Here, the trustee of the Suppliers-Crossroads PACA Trust (Meuers) brought an action against a third party (Reasor's) on behalf of the trust and its beneficiaries (the Suppliers). This is entirely consistent with general trust principles, and we therefore

19

reject Reasor's argument to the contrary.[11]  We now proceed to discuss Reasor's affirmative defense under general trust principles.

Reasor's characterizes its affirmative defense as "set off," but the most recent authority on general trust principles simplified all third party defenses into one affirmative defense: bona fide purchaser.  *See* Restatement (Third) of Trusts § 108(2) ("A third party who acquires an interest in trust property through a breach of trust is entitled to retain or enforce the interest to the extent the third party is protected as a bona fide purchaser."); *see also id.* § 108 Reporter's Notes ("This Section is consistent with but a condensation of Restatement Second, Trusts §§ 284–285, 321–326.").[12]  Because "the bona fide purchaser term . . . has been consistently used in the case law regarding PACA and third party recipients of trust assets," we will follow suit.  *Spada Props., Inc. v. Unified Grocers, Inc.*, 38 F. Supp. 3d 1223, 1233 n.5 (D. Or. 2014).

"[W]hen trust assets are held by a third party, resulting in the failure of the trustee to pay unpaid sellers of perishable agricultural commodities, the third party may be required to disgorge the trust assets unless the third party can establish that it has some defense, such as having taken the assets as a bona fide purchaser without

---

[11] Reasor's primarily relies on *In re So Good Potato Chip Co.*, 124 B.R. 298 (Bankr. E.D. Mo. 1991), for its argument regarding who may maintain an action under PACA.  The bankruptcy court in *So Good Potato Chip* neither cites to nor appears to rely on any general trust principles in its decision.  Accordingly, we decline to follow it.

[12] The concept of "set off" under general trust principles is found in Restatement (Second) of Trusts § 323.

20

notice of the breach of trust." *Nickey Gregory Co. v. AgriCap, LLC*, 597 F.3d 591, 595–96 (4th Cir. 2010). A defendant bears the burden of proof to show that an affirmative defense, such as bona fide purchaser, applies. *Albee Tomato, Inc. v. A.B. Shalom Produce Corp.*, 155 F.3d 612, 615 (2d Cir. 1998) ("In establishing the protected status of bona fide purchaser, the burden of proof is on the transferee."); *see also Johnson v. Riddle*, 443 F.3d 723, 724 n.1 (10th Cir. 2006) (explaining that the defendant bears the burden of proof on an affirmative defense). Reasor's, therefore, had to show by a preponderance of the evidence that it received the $308,721.23 in trust assets (1) "for value" and (2) "without notice of the breach of trust." Restatement (Second) of Trusts § 284(1).[13] As Reasor's fails to satisfy the first requirement of the bona fide purchaser defense, we need proceed no further.

Reasor's did not receive the trust assets for value. Under general trust principles, there is a general rule that "if [a] trustee transfers trust property in consideration of the extinguishment of a pre-existing debt or other obligation, the transfer is not for value." *Id.* § 304(1). There are three limited exceptions to the general rule: where "the trust property transferred is a negotiable instrument or

---

[13] The Restatement (Third) of Trusts "does not undertake the laborious treatment of the application of the bona fide purchaser rule found in" the Restatement (Second) of Trusts because "[t]he doctrine of bona fide purchase and the definition of a bona fide purchaser are already adequately addressed in other Restatements and in commercial law." Restatement (Third) of Trusts § 108 cmt. c (internal quotation marks omitted). Therefore, we apply the doctrine of bona fide purchase stated in other Restatements, including the Restatement (Second) of Trusts.

money," when "the transferee held security for the debt or other obligation and surrendered the security," and a general equitable "change of circumstances" exception. *Id.* § 304(2).[14]

Here, none of the exceptions apply. Crossroads did not transfer money, a negotiable instrument, or a security interest to Reasor's when it disposed of the receivable. Further, there are no equitable concerns in recognizing the Suppliers' right to recover under PACA instead of any set off claim asserted by Reasor's. In this case, Crossroads simply extinguished Reasor's $172,903.14 debt owed to the Suppliers-Crossroads PACA Trust by a transfer that was not, under general trust principles, for value. *See id.* § 304 cmt. a. Since Reasor's did not satisfy the first requirement of the bona fide purchaser defense, we need not reach the second.

In sum, Reasor's has failed to establish an affirmative defense to its possession of trust assets transferred in breach of trust, and Meuers is entitled to the $172,903.14 which the district court permitted Reasor's to set off.

### 4.    *The Dissent*

The dissent contends that even outside of §§ 499b(4) and 499a(b)(13), $172,903.14 worth of rebates extended to Reasor's by Crossroads were permissible because they "satisf[ied] obligations that are commercially reasonable and consistent

---

[14] There is also an extension of the negotiable instrument or money exception: where "the trustee transfers trust property in consideration both of the extinguishment of a pre-existing debt or other obligation and of the payment of money or transfer of other property or the rendition of services, the transfer is for value." Restatement (Second) of Trusts § 304(3).

with the trustee's duties under PACA."  The analysis set forth above answers much of this argument, and we reject the dissent's position for at least two additional reasons.

First, the dissent's assertion that rebates and other "collateral fees and expenses" are permitted by general trust principles contradicts the very statutory provisions giving rise to the dissent's PACA argument.  If a PACA trustee was already allowed by trust law to countenance promotional allowances, rebates, service fees, and materials fees, then Congress accomplished nothing when it amended §§ 499b(4) and 499a(b)(13) in 1995.  This circuit has long recognized that "[w]e do not and should not suppose that Congress intended to enact unnecessary statutes." *Jackson v. Kelly*, 557 F.2d 735, 740 (10th Cir. 1977).  Similarly, "[i]t is a cardinal principle of statutory construction that a statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW, Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (citation and internal quotation marks omitted).  Under the dissent's view, §§ 499b(4) and 499a(b)(13) are at best insignificant and at worst superfluous, because they convey rights that trustees already enjoy by virtue of trust law.

Second, the dissent's "commercial reasonableness" approach is not even the law in the Second Circuit, the court from which the dissent purports to draw support. The dissent cites *E. Armata, Inc. v. Korea Commercial Bank of N.Y.*, 367 F.3d 123 (2d Cir. 2004), a case involving fees associated with a checking account, for the proposition that a trustee may act in a commercially reasonable manner consistent

23

with its fiduciary duties. But in *Coosemans Specialties, Inc. v. Gargiulo*, 485 F.3d 701 (2d Cir. 2007), the Second Circuit distinguished *E. Armata* on the ground that the latter case involved "a PACA suit against a third-party bank," rather than a suit against a PACA trustee. *Id.* at 706. The Second Circuit then rejected an independent "commercial reasonableness" test like the one embraced by the dissent:

> We have never held that a PACA trustee can escape all liability for entering into a transaction that results in a large loss of PACA assets merely by showing that the transaction was commercially reasonable on its face. Nothing in *E. Armata* suggests that, simply by entering into a commercially reasonable transaction, a PACA trustee necessarily avoids breaching its fiduciary duty. Instead, whether a transaction is commercially reasonable is simply one factor that may be relevant in determining whether a PACA trustee has met its ultimate burden of proving that trust assets remained freely available to plaintiffs.

*Id.* at 706–07;[15] *see also Nickey Gregory*, 597 F.3d at 604–05 (indicating that the reasoning in *E. Armata* at most should be applied to "bank checking accounts that are subject to banking rules and regulations," because interpreting the decision more broadly "would undoubtedly conflict with the purpose and effect of PACA").

---

[15] The court in *Coosemans* concluded that PACA trust assets must remain "freely available" to beneficiaries under 7 C.F.R. § 46.46(d)(1). 485 F.3d at 706. Section 46.46(d)(1) further provides that "[a]ny act or omission which is inconsistent with this responsibility, including dissipation of trust assets," is unlawful. USDA regulations define "dissipation" as "any act or failure to act which could result in the diversion of trust assets or which could prejudice or impair the ability of unpaid suppliers, sellers, or agents to recover money owed in connection with produce transactions." 7 C.F.R. § 46.46(a)(2). These provisions provide even more support for the conclusion we reach today.

24

## IV

Resolving this case, as we must, based solely on the arguments presented by the parties, we hold that the district court erred when it failed to apply a PACA trust to all monies withheld by Reasor's, which would have resulted in entry of judgment in favor of Meuers in the full $308,721.73 amount. Therefore, we affirm in part, reverse in part, and remand to the district court with instructions to enter judgment for Meuers in the additional sum of $172,903.14 and to grant any other relief it may deem appropriate.

Entered for the Court


Mary Beck Briscoe
Circuit Judge

25

*Meuers Law Firm, et al. v. Reasor's, et al.*, 18-5055

**CARSON**, J., concurring in the judgment in part and dissenting in part.

The majority holds that Meuers may recover all of the PACA trust assets—$308,721.73—that Reasor's retained to satisfy Crossroads' unpaid rebates. The majority is only partly correct.

For the reasons I describe below, I concur in the judgment with the majority's holding that Meuers may recover the $135,818.59 that Reasor's unilaterally retained (what I call the "Unilateral Payments"). But I respectfully dissent from the majority's holding that Meuers may recover the $172,903.14 that Crossroads permitted Reasor's to retain (what I call the "Authorized Payments").

I.

To start, I agree with the majority that 7 U.S.C. § 499e(c)(2) broadly extends PACA trust protections to "all transactions" involving perishable agricultural commodities and "any receivables . . . from the sale of" those commodities. The plain language of § 499e(c)(2) makes that conclusion unavoidable. By extension, the account receivable at issue in this case is clearly an asset subject to a PACA trust.

I part ways with the majority, however, when it turns a blind eye to 7 U.S.C. § 499b(4) and 7 U.S.C. § 499a(b)(13). As the majority observes, § 499b(4) mandates that "the good faith offer, solicitation, payment, or receipt of collateral fees and expenses" is not "unlawful under [PACA]." And § 499a(b)(13) defines "collateral fees and expenses" as "any promotional allowances, *rebates*, service or materials fees paid or provided,

directly or indirectly, in connection with the distribution or marketing of any perishable agricultural commodity." 7 U.S.C. § 499a(b)(13)(emphasis added).

That clear statutory language warrants judgment in favor of Reasor's for the Authorized Payments. Those payments were for collateral fees and expenses—more specifically, they were payments of rebates. Further, no evidence suggests that Crossroads did not make those payments in good faith (a point that I discuss further below). By the very terms of § 499b(4), the Authorized Payments were therefore not unlawful under PACA. And of course, if they were not unlawful under PACA, then Crossroads did not breach the PACA trust by ostensibly failing to keep control of the trust's assets. I would thus affirm the district court's decision precluding Meuers from recovering the $172,903.14.

True, Reasor's does not make any arguments on appeal relating to § 499b(4) or § 499a(b)(13). Nor did it do so in the district court. Meuers has similarly omitted any reference to either of those statutes. Presumably, both parties unintentionally overlooked that language, which is troubling given the statutes' clear relevance. In no way do I condone that oversight, and I recognize that we usually would not reward Reasor's for failing to cite or invoke applicable law. See, e.g., Henderson ex rel. Henderson v. Shinseki, 562 U.S. 428, 434 (2011) ("[C]ourts are *generally* limited to addressing the . . . arguments advanced by the parties. Courts do not usually raise . . . arguments on their own." (emphasis added) (citation omitted)).

With that said, if "an issue . . . is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent

2

power to identify and apply the proper construction of governing law." United States v. Bustamante-Conchas, 850 F.3d 1130, 1141 n.7 (10th Cir. 2017) (en banc) (quoting U.S. Nat'l Bank v. Indep. Ins. Agents of Am., Inc., 508 U.S. 439, 446 (1993)). Although, of course, exercising that power is often inappropriate—a point the majority seizes upon—the Supreme Court has nevertheless suggested we should do so when the governing law that went unobserved is "'antecedent to and ultimately dispositive of' the dispute before" us. U.S. Nat'l Bank, 508 U.S. at 447 (ellipsis omitted) (quoting Arcadia v. Ohio Power Co., 498 U.S. 73, 77 (1990)). The reason why is obvious: pretending otherwise and "render[ing] judgment on the basis of a rule of law whose nonexistence is apparent on the face of things, simply because the parties agree upon it," only serves to "reinforce error." United States v. Burke, 504 U.S. 229, 246 (1992) (Scalia, J., concurring in the judgment); see also U.S. Nat'l Bank, 508 U.S. at 447 (endorsing Justice Scalia's logic). Thus, should we become aware of such undeniably case-ending law, we are not "oblige[d] . . . to treat [an] unasserted argument" relating to that law "as having been waived."[1] U.S. Nat'l Bank, 508 U.S. at 447.

Such is the case here. The salient issue—whether Reasor's must disgorge the Authorized Payments to Meuers—is properly before us. Further, as I describe above, § 499b(4) and § 499a(b)(13) are governing law that definitively settle that issue. After all, if Crossroads did not breach the PACA trust in the first place (which those two

---

[1] This principle seems to apply with special force when, as in this case, the central issue turns on whether a statute governs. See, e.g., U.S. Nat'l Bank, 508 U.S. at 445–48 (holding that the court of appeals had the discretion to consider the validity of a statute even though the parties had not questioned its validity).

3

statutes prove it did not), then we lack a basis to force Reasor's to hand those payments over. And § 499b(4) and § 499a(b)(13) are antecedent to the disgorgement issue for the same reason: no breach, no disgorgement. In sum, we have every reason to affirm the district court's decision regarding the Authorized Payments even though "the parties fail[ed] to identify and brief" the applicable law. U.S. Nat'l Bank, 508 U.S. at 447.

But to the extent any doubts remain, an additional reason should tip the scales in favor of applying § 499b(4) and § 499a(b)(13)—namely, that *not* applying those statutes risks characterizing entirely lawful conduct as unlawful. The majority falls into that very trap. Take a step back and consider in broader terms the majority's conclusion regarding the Authorized Payments. The majority is effectively ruling that Crossroads breached its duties as a PACA trustee even though Congress has expressly said that Crossroads did not breach its duties as a PACA trustee. That troubles me. I cannot act as if an activity is unlawful when I know that a congressional statute confirms it is not. But the majority does just that, which ultimately punishes Reasor's for conduct that was not wrong in the first place. I will not endorse that result.

The majority's argument to the contrary—that disregarding § 499b(4) and § 499a(b)(13) is the correct course of action because we do not know and cannot decide the factual question whether Crossroads acted in "good faith" under § 499b(4)—is unconvincing. For one thing, I simply disagree with the majority that neither Meuers or Reasor's had a fair opportunity to develop the factual record bearing on that question of good faith. See Brown v. Perez, 835 F.3d 1223, 1236 (10th Cir. 2016) (directing us to consider, when deciding whether to affirm on an alternate ground, whether the parties

4

had "a fair opportunity to develop the factual record" (quoting Elkins v. Comfort, 392 F.3d 1159, 1162 (10th Cir. 2004))). That the parties did not realize § 499b(4) came into play does not mean that they were not on the lookout for evidence that Crossroads had made the Authorized Payments in good or bad faith. Reasor's, for instance, had every reason to be on the lookout for that evidence because evidence that Crossroads had made the Authorized Payments in good faith could have reinforced Reasor's claim that it was a bona fide purchaser—after all, if Crossroads was acting in good faith, Reasor's could have argued that it had no reason to suspect any breach of the PACA trust. And Meuers had every reason to be on the lookout for that evidence for a similar reason: if Crossroads had acted in bad faith, Meuers could have leveraged that evidence to refute Reasor's claim that it was a bona fide purchaser. The point is that evidence pertaining to good faith had such obvious relevance that I have a difficult time believing the parties did not have a fair opportunity to develop the factual record in that regard. See Restatement (Third) of Trust § 76(1) (instilling trustees with the general "duty to administer the trust[] diligently and *in good faith*" (emphasis added)); cf. Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 37 (1991) (Stevens, J., dissenting) (discussing issues that are "so integral to decision of the case that they [can] be considered fairly subsumed by the actual questions presented" (internal quotation marks omitted)).

Further, the parties' stipulated facts make no mention of Crossroads acting in bad faith when making the Authorized Payments, which in my opinion means the parties agree that Crossroads acted in good faith. See Brown, 835 F.3d at 1236 (directing us to consider, when deciding whether to affirm on an alternate ground, "whether, in light

5

of . . . *uncontested facts*, our decision would involve only questions of law" (emphasis added) (quoting Elkins, 392 F.3d at 1162)).  Again, in light of the obvious relevance of the good-faith/bad-faith inquiry, one would expect Meuers—a trustee trying to recover significant sums of money—to shout from the rooftops that Crossroads had acted in bad faith if Meuers had even *suspected* that were actually the case.  But that did not happen, and for good reason.  Crossroads owed Reasor's payment for rebates.  Reasor's demanded that payment.  Crossroads then provided that payment.  That course of events seems like the prototypical example of good faith.  See 7 C.F.R. § 46.2(hh) (defining good faith under PACA as "honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade").  I thus believe that Meuers and Reasor's did not dispute the issue of good faith because they could not say with a straight face that Crossroads had acted in bad faith.  In turn, I believe that the parties' stipulated facts allow us to apply § 499b(4) and § 499a(b)(13) as a matter of law.  See United States v. Taylor, 97 F.3d 1360, 1364 (10th Cir. 1996) ("The district court failed to make specific [factual] findings relative to this issue.  However, we may address it because 'we are free to affirm a district court decision on any grounds for which there is a record sufficient to permit conclusions of law, even grounds not relied upon by the district court.'" (quoting Griess v. Colorado, 841 F.2d 1042, 1047 (10th Cir. 1988)).

But let's assume that I'm entirely wrong and that the circumstances weigh against affirming the district court's decision regarding the Authorized Payments on the basis of § 499b(4) and § 499a(b)(13).  Even if the parties did not have a fair opportunity to develop the factual record bearing on the question of good faith under § 499b(4), and

6

even if the parties' silence on that question would require us to act as the initial factfinder on appeal, I still think other deep-seated issues underlie the majority's opinion.

First, why not simply remand this case to the district court to make a factual finding on the issue of good faith under § 499b(4)? The majority does not even consider that option, yet it seems to be the logical backup plan should we not be able to affirm outright via § 499b(4) and § 499a(b)(13). Indeed, although the majority chastises me for (supposedly) committing the "uncharacteristic" and "virtually unprecedented" sin of acting as a factfinder on appeal, I believe an even greater sin is labeling activity unlawful when a simple procedural fix would definitively establish that it is not.

Second, in the absence of § 499b(4) and § 499a(b)(13), the majority makes a weak case that Crossroads breached the PACA trust. The majority's analysis boils down to "general trust principles" that require a trustee to "keep control of" trust assets, an obligation which the majority concludes Crossroads failed to live up to when it authorized a setoff from the account receivable. Restatement (Third) of Trust § 76 cmt. d. That analysis, however, fails to account for *other* trust principles that require us to take into account the unique realities that make up the world of PACA trusts. And when accounting for those realities, I believe that Crossroads' authorization of the setoff—an action that was commercially reasonable and consistent with its duty as a PACA trustee

to make trust assets freely available to the Suppliers—did not amount to a breach of trust.[2]

Consider first the application of general trust principles.  Although trustees surely have the duty to keep control of trust assets, the majority fails to note a corollary principle of trust law that clarifies that duty.  Namely, "[t]he manner of . . . maintaining control of the trust property depends on the nature of the property, the terms of the trust, and what is appropriate to the prudent administration of the trust."  Restatement (Third) of Trusts § 76 cmt. d.  In layman's terms, that means the duty to keep control of trust assets is not black or white in the way the majority makes it out to be.  Rather, that duty applies differently depending on the specific trust at issue.  And for that reason, we must analyze the characteristics of any given trust with a sharp eye when determining whether a trustee breaches his, her, or its duty to keep control of the trust's assets.

To that end, next consider some simple truths about PACA trusts.  For one thing, nearly all PACA trustees pay regular business expenses with trust assets—even when they have not yet fully paid the PACA beneficiaries.  See, e.g., Farm-Wey Produce, Inc. v. Wayne L. Bowman Co., 973 F.Supp. 778, 784 (E.D. Tenn. 1997) ("It is unlikely that any produce broker exists that pays no business expenses other than its suppliers."); id. ("In such a case, any payment of ordinary business expenses must necessarily be made from [PACA] trust assets.").  Further, courts can hold PACA trustees individually liable

---

[2] Unlike any arguments it could have made (but ultimately did not make) pertaining to § 499b(4) and § 499a(b)(13), Reasor's *does* argue that Crossroads' actions were commercially reasonable and thus not a breach of the PACA trust.

for breaching PACA trusts. See, e.g., Morris Okun, Inc. v. Harry Zimmerman, Inc., 814 F. Supp. 346, 348 (S.D.N.Y. 1993) ("[A] PACA trust in effect imposes liability on a trustee, whether a corporation *or a controlling person of that corporation . . . .*" (emphasis added)). Putting two and two together, I seriously doubt that Congress intended for a PACA trustee to be individually liable for breaching the PACA trust "every time" that he, she, or it "dissipat[es] trust assets" to pay regular business expenses. Farm-Wey Produce, 973 F. Supp. at 784; see also Restatement (Third) of Trusts § 88 cmt. a (observing that trustees may "pay proper expenses directly from the trust estate").

The reasoning underlying the majority's holding, however, naturally leads to such a conclusion. That seems problematic. Again, absent the law demanding it (which the law does not), I view with suspicion any holding that will effectively cause PACA trustees to breach their fiduciary duties on a daily basis. My suspicion doubles when many of those daily breaches will stem from the trustee paying off obligations—such as rebates, as I explain more below—that he, she, or it, incurred for the benefit of the trust in the first place. Cf. S & H Packing & Sales Co. v. Tanimura Distrib., Inc., 883 F.3d 797, 822 (9th Cir. 2018) (en banc) (Ikuta, J., dissenting) ("[T]he . . . theory of breach . . . that the [PACA] trustee cannot repay a loan to the trust until all beneficiaries have been paid . . . would likely preclude a trustee from borrowing money secured by trust assets.").

I believe that Congress would have recognized and endorsed my perspective since at least 1984. See id. at 815 (Ikuta, J., dissenting) ("Congress added a trust mechanism to PACA in 1984."); see also Restatement (Second) of Trusts § 244 cmt. b (noting twenty-five years earlier in 1959 that "[i]f the trustee properly incurs a liability in the

9

administration of the trust, he is entitled to . . . *us[e] trust property* in discharging the liability so that he will not be compelled to use his individual property in discharging it" (emphasis added)). I thus believe that Congress eventually enacted § 499b(4) and § 499a(b)(13) eleven years later in 1995 to *make clear* that a PACA trustee's act of paying collateral fees and expenses is not a breach of the PACA trust. Contrary to the majority's suggestion, that does not mean "Congress accomplished nothing" in passing those statutes if PACA trustees could already lawfully pay collateral fees and expenses with trust assets for over a decade. The more likely explanation is that Congress had intended all along to exempt the act of paying collateral fees and expenses from PACA liability, had witnessed courts misapplying "general trust principles" come to the contrary conclusion (as the majority ultimately does today), and decided to alleviate any confusion on the matter by passing § 499b(4) and § 499a(b)(13). Put differently, Congress may— and often does—pass statutes to definitively clarify its prior intent. See Brown v. Thompson, 374 F.3d 253, 259 (4th Cir. 2004) ("Certainly, Congress may amend a statute to establish new law, but it also may enact an amendment 'to clarify existing law, to correct a misinterpretation, or to overrule wrongly decided cases.'" (quoting United States v. Sepulveda, 115 F.3d 882, 885 n.5 (11th Cir. 1997))). I am aware of no authority that suggests a federal law is insignificant or superfluous simply because that law refines a view Congress previously adopted in a less-than-clear manner.

In any event, and for the reasons I describe above, concluding that Crossroads breached the PACA trust when authorizing the setoff leads to an impractical result. I therefore believe that, even before passing § 499b(4) and § 499a(b)(13), Congress

10

intended some limiting factor to come into play to alleviate the concern that PACA trustees would face unreasonable liability.

The Second Circuit persuasively articulates that limiting factor in E. Armata, Inc. v. Korea Commercial Bank of New York, 367 F.3d 123 (2d Cir. 2004).  In that case, the Second Circuit held that a PACA trustee's commercially reasonable payment of trust assets to a third-party does not amount to a breach of the PACA trust—at least as long as the payment is consistent with the trustee's duty to make the trust assets freely available to the trust's beneficiaries.  Id. at 133–34; see also 7 C.F.R. § 46.46(d)(1) (requiring PACA trustees to make PACA trust assets "freely available to satisfy outstanding obligations to sellers of perishable agricultural commodities").  In reaching that conclusion, the court reasoned that the PACA trustee—who had used PACA trust funds to pay banking fees and interest on a checking account—had not breached the trust because "maintaining a checking account with commercially reasonable terms may facilitate, rather than impede, the fulfillment of a PACA trustee's duty to maintain trust assets so that they are freely available to satisfy outstanding obligations to sellers of perishable commodities."  Id. (internal quotation marks omitted); see also Am. Banana Co. v. Republic Nat'l Bank of N.Y., 362 F.3d 33, 42 (2d Cir. 2004) ("Nor are we convinced that a trustee's payments of commercially reasonable fees and interest in exchange for routine banking services such as check cashing services and overdraft privileges extended to facilitate payments to beneficiaries necessarily constitute a breach of the PACA trust."); cf. S & H Packing, 883 F.3d at 825 (Ikuta, J., dissenting) ("[U]nless the transaction is commercially unreasonable or otherwise a breach of the trustee's

11

fiduciary duty, there is no basis under PACA or trust law for depriving the lender of its right to repayment under the loan agreement or, as in this case, requiring a lender that has loaned money to the trust and been repaid by the borrower to return the borrower's repayment.").

I find the Second Circuit's logic in E. Armata sound and persuasive. After all, so long as the PACA trustee acts in a commercially reasonable manner consistent with its fiduciary duty of maintaining the free availability of trust assets, the beneficiary of the PACA trust is adequately protected from any nefarious, negligent, or otherwise inadequate trustees. At the same time, the Second Circuit's approach in E. Armata safeguards a PACA trustee from unintentionally breaching the PACA trust whenever it engages in common actions such as paying business expenses.[3]

For that reason, I believe that even if we do not apply § 499b(4) and § 499a(b)(13) to the facts of this case, Crossroads still did not breach the PACA trust when it made the Authorized Payments. First, authorizing Reasor's to retain part of the amount it owed Crossroads in exchange for a corresponding reduction in Crossroads' outstanding rebate balance was a commercially reasonable action. That action resolved an obligation (the rebates) Crossroads had contemporaneously assumed to facilitate a larger transaction

---

[3] The majority notes that at least two cases—a Second Circuit case postdating E. Armata and a Fourth Circuit case—distinguish and seek to limit E. Armata. See Coosemans Specialties, Inc. v. Gargiulo, 485 F.3d 701 (2d Cir. 2007); Nickey Gregory Co. v. AgriCap, LLC, 597 F.3d 591 (4th Cir. 2010). Although that may be true, the majority never takes on the reasoning of E. Armata directly or otherwise explains what about that case is flawed. I therefore stand by E. Armata even in light of this other authority and maintain that the Second Circuit got it right the first time around.

12

(selling the produce) that had benefitted the trust as a whole. And the Restatement of Trusts suggests that using trust assets to pay obligations fitting that rubric is entirely appropriate. See Restatement (Third) of Trusts § 88 cmt. b ("[I]f a trustee borrows funds from a third party for use in the administration of the trust, the interest on the loan is payable (or reimbursable) from the trust estate, provided the rate of interest is reasonable and the borrowing serves an appropriate trust purpose and is otherwise consistent with the trustee's fiduciary duties."). Of course, if an action is appropriate, labeling it commercially *unreasonable* would make little sense.

Second, Crossroads acted consistently with its duty as a PACA trustee to maintain the free availability of the trust's assets when it authorized the setoff. To understand why, consider in more detail how Crossroads' willingness to assume the rebate liability benefited the PACA trust as a whole. In short, the PACA trust obtained its assets *largely because* Crossroads had agreed with Reasor's to assume the rebate liability. Without those rebates, Reasor's almost certainly would have turned to another seller to obtain produce at a cheaper price. For the same reason, Reasor's right to receive the rebates likely convinced it to keep coming back to Crossroads to buy produce again and again. That recurrent business relationship would, of course, have resulted in the PACA trust receiving more and more money over time. Thus, whenever Crossroads paid off its rebate liability, incoming trust assets would have offset those payments and allowed Crossroads to satisfy its obligations to the Suppliers. So from a larger, overarching perspective, Crossroads *was* ensuring that the PACA trust's assets were freely available to the Suppliers whenever it paid off its rebates. In my opinion, PACA requires nothing

13

more even though individual rebate payments (such as the Authorized Payments) may have momentarily reduced the trust's assets.[4]

Thus, even if we choose not to apply § 499b(4) and § 499a(b)(13), the result should be the same as if we did. As shown, that analysis requires a few extra steps, but it ultimately should not make a difference. Regardless of whether we take the shortcut or the scenic route, the final destination remains the same.

As the majority notes, though, one can ostensibly read Department of Agriculture regulations in such a way that, without recourse to § 499b(4) and § 499a(b)(13), he or she may think Crossroads breached the PACA trust. See 7 C.F.R. § 46.46(d)(1) (noting that "[a]ny act or omission which is inconsistent with" the duty to make PACA trust assets freely available to trust beneficiaries, "including dissipation of trust assets," is unlawful (emphasis added)).

But those regulations just make me come full circle: Why are we pretending that § 499b(4) and § 499a(b)(13) do not apply? This is not a case where a statute makes clear that conduct is *un*lawful but we nonetheless presume it is lawful because the suing party failed to cite the statute—a harsh result, to be sure, but one that I can at least accept. Nor

_____

[4] Bolstering this conclusion is the fact that PACA trusts are nonsegregated floating trusts that commingle trust assets from multiple suppliers and third-party buyers of produce. See 7 C.F.R. § 46.46(b) ("[PACA] [t]rust assets are to be preserved as a nonsegregated 'floating' trust. Commingling of trust assets is contemplated."). Thus, even aside from Reasor's and the Suppliers, *other* produce suppliers and third-party buyers likely contributed to the PACA trust in this case. If so, Crossroads would have often had other trust assets at hand with which to pay its obligations to the Suppliers. See S & H Packing, 883 F.3d at 822 (Ikuta, J., dissenting) (discussing the effects of PACA trusts being nonsegregated floating trusts).

14

is it a case where we are *pretty* sure that a statute makes the conduct lawful. Instead, this is a case where *a statute clearly demonstrates that conduct was lawful*, but the majority nevertheless calls it unlawful. Few legal scenarios would seem more unjust to the lay observer.

By no means am I advocating for us to raise or pursue every possible argument that a party could have made on his, her, or its behalf. See Cordova v. Aragon, 569 F.3d 1183, 1191 (10th Cir. 2009) ("It is not our role to sift through the record to find evidence not cited by the parties to support arguments they have not made."). Indeed, if a future party in a similar position to Reasor's fails to cite a governing statute that would definitively establish the lawfulness of its behavior, that party risks reaping its just deserts for that failure should we not recognize the statute's relevance or should we exercise our discretion to deem the argument waived. Even so, if we come across such a statute by virtue of our own research, I see no reason why we should not apply it. By doing anything else, the parties do not benefit, our precedent does not benefit, and the rule of law as a whole certainly does not benefit.

I therefore respectfully dissent from the majority's holding relating to the Authorized Payments.

### III.

In contrast to the Authorized Payments, the Unilateral Payments force us into murkier territory. True, the Unilateral Payments could conceivably represent Reasor's receipt of collateral fees and expenses—namely, the receipt of rebates. See 7 U.S.C. §§ 499a(b)(13), 499b(4). But in my view, Reasor's very well might *not* have retained

15

those payments in good faith given that it did so without Crossroads' permission. That means § 499b(4) and § 499a(b)(13) might not be "ultimately dispositive of" the issue whether Reasor's must disgorge the Unilateral Payments to Meuers, which negates a large portion of the concerns I outline above when discussing the Authorized Payments. U.S. Nat'l Bank, 508 U.S. at 447. To be sure, we could remand for the district court to make a definitive factual finding on the question of good faith—a possibility I also discuss above—but I do not feel as compelled to do so given that the answer is not as clear-cut as it is for the Authorized Payments.

In any event, compounding my reluctance is that the Unilateral Payments also do not satisfy my preferred commercial-reasonableness standard. More specifically, because Crossroads did not authorize the Unilateral Payments, calling those payments "commercially reasonable" is a stretch. Further, Crossroads' lack of involvement in those payments means it had no way of *acting* in a way consistent with its duty to make the PACA trust assets freely available to the Suppliers. Thus, in the absence of § 499b(4) and § 499a(b)(13), I can rest assured that requiring Reasor's to disgorge the Unilateral Payments is the correct course of action.

I would therefore affirm the district court's decision requiring Reasor's to disgorge the $135,818.59. And for that reason, I concur in the judgment with the majority's holding relating to the Unilateral Payments.

## IV.

"At bottom, the majority's concern appears to be that trust principles are insufficiently protective of [the Suppliers] here." S & H Packing, 883 F.3d at 824 (Ikuta,

16

J., dissenting).  While I understand that concern, I am not willing to ignore Congress's clear statutory mandate to give it effect.  I therefore respectfully concur in the judgment in part and dissent in part.